# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| MICHAEL J. DAUGHERTY and LABMD, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: _____ |
| JOEL P. ADAMS; DAVID J. BECKER; ROBERT J. BOBACK; ANJU S. CHOPRA; WESLEY K. CLARK, SR.; JOHN C. HANSBERRY; SAM P. HOPKINS; M. ERIC JOHNSON; ERIC D. KLINE; DANIEL J. KOPCHAK; LARRY PONEMON; HOWARD SCHMIDT; KEITH E. TAGLIAFERRI; BRIAN J. TARQUINIO; MORGAN, LEWIS AND BOCKIUS, LLP; PEPPER HAMILTON LLP; TIVERSA HOLDING CORP.; TRUSTEES OF DARTMOUTH COLLEGE; and DOES 1 – 10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

# COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................ 8

PARTIES ......................................................................................... 12

  A.  Plaintiffs ................................................................................ 12

  B.  Defendants .............................................................................. 12

JURISDICTION AND VENUE ......................................................... 19

FACTS ............................................................................................ 20

  A.  Tiversa's Business Model ......................................................... 20

    1.  Step 1 - Steal ...................................................................... 22

      a.  Tiversa's Technologies ..................................................... 22

        (i)  Theft ........................................................................ 24

        (ii)  Fraud ...................................................................... 25

        (iii) Interference ............................................................ 25

        (iv) Espionage .............................................................. 26

        (v)  Data Manipulation ................................................... 27

      b.  Private Files ................................................................... 28

      c.  Confidential Files ........................................................... 29

      d.  Classified Files .............................................................. 30

    2.  Step 2 - Lie ........................................................................ 31

      a.  The Publicly Available Lie .............................................. 31

      b.  Fraud Re: Source ........................................................... 32

      c.  Fraud Re: Disclosure ...................................................... 32

      d.  Fraud Re: Spread ........................................................... 33

      e.  Fraud Re: Bad Actors ..................................................... 33

    3.  Step 3 - Threaten ................................................................ 34

    4.  Step 4 – Retaliate ............................................................... 36

      a.  The List ......................................................................... 36

  b. The Privacy Institute ............................................................. 36

B. Conspiracy ................................................................................ 38

 1. Conspirators ........................................................................ 38

  a. Kline, Morgan Lewis and Tarquinio ................................. 38

  b. Clark, Schmidt and Ponemon ........................................... 41

  c. Adams, Becker, Chopra, Hopkins, Kopchak and Tagliaferri ............... 49

  d. Johnson and Dartmouth .................................................... 51

  e. Kline, Hansberry and Pepper Hamilton ............................ 51

 2. Objective ............................................................................. 51

 3. Implementation ................................................................... 52

C. Tiversa Targets LabMD ............................................................ 55

 1. Step 1 - Steal ...................................................................... 55

  a. Illegal Transfers of Stolen Property ................................. 57

   (i) Johnson and Dartmouth ............................................. 57

   (ii) CIGNA ...................................................................... 59

   (iii) The Privacy Institute ................................................ 60

 2. Step 2 - Lie ......................................................................... 61

 3. Step 3 - Threaten ............................................................... 65

 4. Step 4 - Retaliate ............................................................... 67

  a. The List ............................................................................ 67

  b. Publicity Re: 1718 File .................................................... 68

  c. Preludes to FTC Investigation ......................................... 73

  d. FTC Investigation ........................................................... 75

  e. FTC Enforcement Action ................................................. 77

  f. Federal Defamation Action .............................................. 78

  g. State Defamation Action .................................................. 79

D. Tiversa Targets Other Georgia Companies .............................. 80

1.  Coca-Cola ................................................................................................ 80
    a.  Step 1 - Steal ............................................................................... 80
    b.  Step 2 - Lie .................................................................................. 81
    c.  Step 3 - Threaten ......................................................................... 82
    d.  Step 4 - Retaliate ......................................................................... 82
2.  Papa John's ............................................................................................ 83
    a.  Step 1 - Steal ............................................................................... 83
    b.  Step 2 - Lie .................................................................................. 84
    c.  Step 3 - Threaten ......................................................................... 85
    d.  Step 4 - Retaliate ......................................................................... 85
3.  Logisticare ............................................................................................ 86
    a.  Step 1 - Steal ............................................................................... 86
    b.  Step 2 - Lie .................................................................................. 87
    c.  Step 3 - Threaten ......................................................................... 88
    d.  Step 4 - Retaliate ......................................................................... 88
4.  Franklin's Budget Auto Sales ............................................................... 89
    a.  Step 1 - Steal ............................................................................... 89
    b.  Step 2 - Lie .................................................................................. 90
    c.  Step 3 - Threaten ......................................................................... 91
    d.  Step 4 - Retaliate ......................................................................... 91
5.  Georgia Music Educators Association ................................................... 92
    a.  Step 1 - Steal ............................................................................... 92
    b.  Step 2 - Lie .................................................................................. 93
    c.  Step 3 - Threaten ......................................................................... 94
    d.  Step 4 - Retaliate ......................................................................... 94
E.  Tiversa Targets AIDS Clinic ..................................................................... 95
    1.  Step 1 - Steal ............................................................................... 95

2.  Step 2 - Lie ..................................................................... 95

3.  Step 3 - Threaten ........................................................... 96

4.  Step 4 - Retaliate ........................................................... 96

F.  LabMD's Due Diligence .................................................... 101

1.  Twenty Four Attorneys ................................................ 101

2.  FTC's Silence ............................................................... 105

3.  LabMD's 2010 Inquiries ............................................... 106

4.  Georgia Action ............................................................. 107

5.  FTC Enforcement Action .............................................. 108

6.  Pennsylvania Action..................................................... 111

G.  Tiversa's Active Concealment of Wrongdoing.................... 112

1.  Frauds in Georgia Action ............................................. 112

a.  Fraudulent Boback Statements ............................. 113

b.  Fraudulent Pepper Hamilton Statements............. 119

2.  Tiversa's Counsels' Misrepresentations and Threats........... 124

3.  Tiversa Concealed Exculpatory Evidence........................ 127

a.  Compulsory Processes ........................................... 127

b.  First Forensic Report............................................ 128

c.  Second Forensic Report ........................................ 129

d.  Internal Email........................................................ 129

H.  Tiversa's Perjured Testimony ............................................ 130

1.  Congress 2007 ............................................................. 130

2.  Congress 2009 ............................................................. 131

3.  Congress 2009 ............................................................. 132

4.  Congress 2014 ............................................................. 133

5.  Georgia Action ............................................................ 134

6.  State Court Defamation Action .................................... 135

7. FTC Enforcement Action ................................................................ 136

    a. November 21, 2013 Testimony.............................................. 136

    b. June 7, 2014 Testimony ........................................................ 140

    c. April 17, 2015 Testimony ..................................................... 142

I. Fabricated Evidence .......................................................................... 145

  1. Third Forensic Report ................................................................. 145

  2. Fourth Forensic Report............................................................... 146

    a. Congress 2014...................................................................... 146

    b. FTC Enforcement Action..................................................... 147

J. FBI Raid............................................................................................ 148

COUNT I – FEDERAL RICO (18 U.S.C. § 1962(c)).............................. 148

    a. 18 U.S.C. § 1028 (Identity Fraud) ...................................... 150

    b. 18 U.S.C. § 1029 (Access Device Fraud) ........................... 152

    c. 18 U.S.C. § 1341 (Mail Fraud) ........................................... 155

    d. 18 U.S.C. § 1343 (Wire Fraud) ........................................... 155

    e. 18 U.S.C. § 1344 (Bank Fraud) ........................................... 156

    f. 18 U.S.C. § 1462 (Obscene Matters) ................................... 156

    g. 18 U.S.C. § 1503 (Obstruction of Justice) ......................... 157

    h. 18 U.S.C. § 1512 (Witness Tampering)............................... 158

    i. 18 U.S.C. § 1513 (Witness Retaliation) .............................. 159

    j. 18 U.S.C. § 1957 (Money Laundering)............................... 160

      (i) 18 U.S.C. § 1030 (Computer Fraud and Abuse) ........... 160

      (ii) 18 U.S.C. § 2252A (Child Pornography) ..................... 163

      (iii) 18 U.S.C. § 2319 (Criminal Infringement of a Copyright) ........... 164

    k. 18 U.S.C. § 2314 (National Stolen Property Act)................ 164

COUNT II – FEDERAL RICO CONSPIRACY (18 U.S.C. § 1962(d))............. 166

COUNT III – GEORGIA RICO (O.C.G.A. § 16-14-4) ........................ 168

a.  O.C.G.A. § 16-9-1 (Forgery) ................................................................ 170

b.  O.C.G.A. § 16-9-93 (Computer Crimes) ............................................ 171

c.  O.C.G.A. § 16-9-121 (Identity Fraud) ................................................ 173

d.  O.C.G.A. § 16-10-70 (Perjury) .......................................................... 174

e.  O.C.G.A. § 16-10-93 (Witness Tampering)........................................ 174

f.   O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) ............................ 175

g.  O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity)............................. 175

COUNT IV – GEORGIA RICO CONSPIRACY (O.C.G.A. § 16-14-4(c)) ........ 177

COUNT V – COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030) .... 178

COUNT VI – GEORGIA COMPUTER CRIMES (O.C.G.A. § 16-9-93(g)) ...... 179

COUNT VII – COMMON LAW FRAUD ............................................................ 180

COUNT VIII – COMMON LAW NEGLIGENCE ............................................... 182

COUNT IX – FRAUDULENT MISREPRESENTATION .................................. 183

COUNT X – NEGLIGENT MISREPRESENTATION ....................................... 184

COUNT XI – COMMON LAW CONSPIRACY ................................................. 186

COUNT XII – ATTORNEYS' FEES AND EXPENSES ................................... 189

PRAYER FOR RELIEF ..................................................................................... 190

"Sin has many tools, but a lie is the handle which fits them all."
                                            Oliver Wendell Holmes
                                            The Autocrat of the Breakfast Tablet (1858)

Plaintiffs Michael J. Daugherty and LabMD, Inc., by and through their undersigned counsel, file this Complaint against Defendants Joel P. Adams, David J. Becker, Robert J. Boback, Anju S. Chopra, Wesley K. Clark, Sr., John C. Hansberry, Sam P. Hopkins, M. Eric Johnson, Eric D. Kline, Daniel J. Kopchak, Larry Ponemon, Howard Schmidt, Keith E. Tagliaferri, Bryan J. Tarquinio, Morgan, Lewis & Bockius LLP, Pepper Hamilton LLP, Tiversa Holding Corp., Trustees of Dartmouth College and Does 1-10, and allege the following:

## NATURE OF THE ACTION

1.      This case starts with a crime and a lie.  The crime - the theft of a confidential file with personal health information on approximately 9,300 patients. The lie – the thief claims the victim made it available to the public.

2.      The criminal is Defendant Tiversa Holding Corp. ("Tiversa"), a so-called cybersecurity firm with advanced technologies for accessing and downloading private, confidential and classified files from thousands of computers via the internet.

3.      The victim is Plaintiff LabMD, Inc. ("LabMD"), a small cancer-detection facility in Atlanta.

4.    The racket - Tiversa offered to return the file to LabMD for a fee, along with the threat that if LabMD refused to pay, Tiversa would report LabMD to the Federal Trade Commission, an agency that was working with Tiversa to prosecute companies for allegedly not keeping confidential consumer information secure.

5.    Tiversa followed through on its threat by reporting LabMD to the FTC along with scores of other companies that also refused to pay Tiversa for its security "services."

6.    Tiversa *lied* about the file.  It told the FTC that it "found" LabMD's file because LabMD had made it "publicly available" on the internet, that LabMD's file was spreading to other computers on the internet and that identity thieves and other criminals had already gotten copies of the file.

7.    Tiversa promised to support the FTC in its investigations and prosecutions of LabMD and other companies that refused to hire it and pay for its services.

8.    LabMD and Michael J. Daugherty ("Daugherty"), LabMD's chief executive officer and sole shareholder, knew that LabMD had done no wrong.  As eventually proved through a former Tiversa employee and whistleblower, Tiversa

had secretly hacked the file directly from a LabMD computer in Atlanta, without any permission or authority, and knew that the file had never "leaked" anywhere.

9.     The FTC investigated LabMD for three and a half years, all due to Tiversa's theft of LabMD's file and incessant lies about the file's whereabouts.

10.     With Tiversa's support, the FTC was unrelenting.  LabMD's dealings with the FTC and Tiversa were so horrendous that Daugherty wrote a book about the ordeal – *The Devil Inside the Beltway*, a stinging indictment of how the FTC partnered with Tiversa to use stolen files, perjured testimony and the might of the federal government to attack a small medical testing business.

11.     Three days after Daugherty announced the upcoming publication of *The Devil Inside the Beltway*, the FTC filed an administrative enforcement action against LabMD (the "Enforcement Action"), relying almost exclusively on the file Tiversa had stolen from LabMD and the lies Tiversa was telling about that file.

12.     Several days after the Enforcement Action was filed, Tiversa, in coordination with the FTC, filed a retaliatory strike against LabMD and Daugherty by filing the first of several frivolous defamation lawsuits against LabMD, Daugherty and others.

13.     On April 2, 2014, a former Tiversa employee blew the whistle on Tiversa and its illegal scheme by exposing Tiversa's crimes and lies.  Immunized

testimony from this individual during the trial of the Enforcement Action, was so convincing that the *FTC* ultimately withdrew *all reliance* upon Tiversa's crimes and lies.

14.    On November 13, 2015, the administrative law judge in the Enforcement Action ruled in favor of LabMD and against the FTC.   Truth prevailed but LabMD did not – Tiversa's crimes and lies had essentially put LabMD out of business almost two years earlier.

15.    This lawsuit is primarily about Tiversa's illegal scheme – its pattern of racketeering activity, its theft and other crimes, its lies and other frauds, its conspirators and accomplices, its predicate acts under state and federal RICO and, ultimately, the liability of all defendants for the harms they have caused LabMD and Daugherty.

16.    This Complaint sets forth approximately twenty (20) predicate acts under the Georgia and Federal Racketeering Influenced Corrupt Organizations ("RICO") Acts (fifteen (15) of which caused actual harm) and over twenty (20) additional criminal violations committed by one or more of the defendants.

17.    This Complaint sets forth twelve (12) claims for relief against eighteen (18) known defendants, including counts for Federal RICO (18 U.S.C. § 1962(c)), Federal RICO Conspiracy (18 U.S.C. § 1962(d), Georgia RICO

(O.C.G.A. § 16-14-4), Georgia RICO Conspiracy (O.C.G.A. § 16-14-4(c)), Computer Fraud and Abuse Act (18 U.S.C. § 1030), Georgia Computer Crimes (O.C.G.A. § 16-9-93(g)), Common Law Fraud, Common Law Negligence, Fraudulent Misrepresentation, Negligent Misrepresentation, Common Law Conspiracy and Attorneys' Fees and Expenses.

## PARTIES

**A.    Plaintiffs**

18.    Plaintiff Michael J. Daugherty, a resident and citizen of Fulton County in the state of Georgia, is over 18 years of age.

19.    Daugherty is the sole shareholder of Plaintiff LabMD, Inc. and is its president and chief executive officer.

20.    Plaintiff LabMD, Inc. is a corporation organized and existing under the laws of the state of Georgia with its principal place of business currently located in Fulton County, Georgia.

**B.    Defendants**

21.    Defendant Joel P. Adams ("Adams") is an individual citizen and resident of the state of Pennsylvania who resides at 1912 Glen Mitchell Rd., Sewickley, PA 15143.  Adams is over 18 years of age and can be served with

process at 1912 Glen Mitchell Rd., Sewickley, PA 15143, 500 Blackburn Ave., Sewickley, PA 15143, or wherever he may be found.

22.    Defendant David J. Becker ("Becker") is an individual citizen and resident of the state of Pennsylvania who resides at 614 Academy Ave., Sewickley, PA 15143.  Becker is over 18 years of age and can be served with process at 614 Academy Ave., Sewickley, PA 15143, 603 Beaver St, Sewickley, PA 15143, or wherever he may be found.

23.    Defendant Robert. J. Boback ("Boback") is an individual citizen and resident of the state of Pennsylvania who is currently residing at 131 Pilgrim Dr., Sewickley, PA 15143.  Boback is over 18 years of age and can be served at 131 Pilgrim Dr., Sewickley, PA 15143.

24.    Boback owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

25.    Boback has served as Tiversa's chief executive officer.

26.    Boback has served as a member of Tiversa's board of directors.

27.    As of the filing of this Complaint, causes of action asserted by LabMD against Boback in *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western

District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, are not included in this action.

28.    Defendant Anju S. Chopra ("Chopra") is an individual citizen and resident of the state of Pennsylvania who resides at 3017 E. Ridge Dr. Gibsonia, PA 15044-6129.  Chopra is over 18 years of age and can be served with process at 3017 E Ridge Dr. Gibsonia, PA 15044-6129, 606 Liberty Avenue Pittsburgh, PA 15222, or wherever she may be found.

29.    Defendant Wesley K. Clark, Sr. ("Clark") is an individual citizen and resident of the state of Arkansas who resides at 1 Crestmont Dr., Little Rock, AR 72227.  Clark is over 18 years of age and can be served with process at 1 Crestmont Dr., Little Rock, AR 72227, or wherever he may be found.

30.    Clark owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

31.    Clark currently serves and/or, during relevant times, has served as a member of Tiversa's advisory board.

32.     Defendant John C. Hansberry ("Hansberry") is an individual citizen and resident of the state of Pennsylvania who resides at 1481 Redfern Dr., Pittsburgh, PA 15241.  Hansberry is over 18 years of age and can be served with

process at 1481 Redfern Dr., Pittsburgh, PA 15241, 500 Grant St., Suite 5000, Pittsburgh, PA 15219, or wherever he may be found.

33.   Defendant Sam P. Hopkins ("Hopkins") is an individual citizen and resident of the state of Pennsylvania who resides at 158 Kingston Ave., Cranberry Township, PA 16066.  Hopkins is over 18 years of age and can be served with process at 158 Kingston Ave., Cranberry Township, PA 16066, or wherever he may be found.

34.   Defendant M. Eric Johnson ("Johnson") is an individual citizen and resident of the state of Tennessee, is over the age of 18 and can be served with process at 401 21st Avenue South, Nashville, Davidson County, TN 37203, 919 Lynnwood Blvd., Nashville, TN 37205 or wherever he may be found.

35.   As of the filing of this Complaint, causes of action asserted by LabMD against Johnson in *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, are not included in this action.

36.   Defendant Eric D. Kline ("Kline") is an individual citizen and resident of the State of Pennsylvania who resides at 776 Larchmont Rd., Pittsburgh, PA 15243.  Kline is over 18 years of age and can be served with process at 776

Larchmont Rd., Pittsburgh, PA 15243, 500 Grant St., Suite 5000, Pittsburgh, PA 15219, or wherever he may be found.

37.    Defendant Daniel J. Kopchak ("Kopchak") is an individual citizen and resident of the state of Pennsylvania who resides at 508 Potomac Ct., Gibsonia, PA 15044. Kopchak is over 18 years of age and can be served with process at 508 Potomac Ct., Gibsonia, PA 15044, or wherever he may be found.

38.    Defendant Larry Ponemon ("Ponemon") is an individual citizen and resident of the state of Michigan who resides at 132 Torch View Dr., Kewadin, MI 49648. Ponemon is over 18 years of age and can be served with process at 132 Torch View Dr., Kewadin, MI 49648, or wherever he may be found.

39.    Ponemon owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

40.    Ponemon currently serves and/or, during relevant times, has served as a member of Tiversa's advisory board.

41.    Defendant Howard Schmidt ("Schmidt") is an individual citizen and resident of the state of Washington who resides at 26638 SE 146th St., Issaquah, WA 98027-6704. Schmidt is over 18 years of age and can be served with process at 26638 SE 146th St., Issaquah, WA 98027-6704, or wherever he may be found.

42.    Schmidt owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

43.    Schmidt currently serves and/or, during relevant times, has served as a member of Tiversa's advisory board.

44.    Defendant Keith E. Tagliaferri ("Tagliaferri") is an individual citizen and resident of the state of Pennsylvania who resides at 76 Winterbrook Dr Cranberry Township, PA 16066.  Tagliaferri is over 18 years of age and can be served with process at 76 Winterbrook Dr., Cranberry Township, PA 16066, or wherever he may be found.

45.    Defendant Brian J. Tarquinio ("Tarquinio") is an individual citizen and resident of the state of Pennsylvania who resides at 6338 Walnut St. Pittsburgh, PA 15206.  Tarquinio is over 18 years of age and can be served with process at 6338 Walnut St. Pittsburgh, PA 15206, 5600 Walnut Street, Pittsburgh, PA 15232, or wherever he may be found.

46.    Defendant Morgan, Lewis & Bockius LLP ("Morgan Lewis") is a limited liability general partnership whose principal place of business is 1701 Market St., Philadelphia, PA, 19103.  Morgan Lewis can be served with process on John G. Ferreira at One Oxford Centre, 32nd Floor, Pittsburgh, PA, 15219-6401, or wherever Mr. Ferreira may be found.

47.    Morgan Lewis, during relevant times, provided legal and other advice and representation to Tiversa and Boback.

48.    Defendant Pepper Hamilton LLP ("Pepper Hamilton") is a limited liability general partnership whose principal place of business is 3000 Two Logan Square, 18th & Arch Streets, Philadelphia, PA, 19118.  Pepper Hamilton can be served with process on Defendant Eric D. Kline, at 500 Grant St., Suite 5000, Pittsburgh, PA 15219, 776 Larchmont Rd., Pittsburgh, PA 15243, or wherever Kline may be found.  Pepper Hamilton can also be served with process on Defendant John C. Hansberry, at 500 Grant St., Suite 5000, Pittsburgh, PA 15219, 1481 Redfern Dr., Pittsburgh, PA 15241, or wherever Hansberry may be found.

49.    Pepper Hamilton, during relevant times, provided legal and other advice and representation to Tiversa and Boback.

50.    Defendant Tiversa Holding Corp. is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Pittsburgh, Pennsylvania.  References to Tiversa include its predecessors and successors.  Tiversa can be served with process on The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

51.    As of the filing of this Complaint, causes of action asserted by LabMD against Tiversa in *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, are not included in this action.

52.    Defendant Trustees of Dartmouth College ("Dartmouth") is organized according to the laws of the state of New Hampshire and may be served with process at 63 S. Main Street, Suite 301, Hanover, NH 03755.

53.    Doe Defendants 1-10 are and were, at all relevant times, citizens of the United States; are as-yet unidentified individuals or entities that actively participated in and/or materially benefitted from the illicit conduct detailed herein; and will be substituted with the proper names of these individuals or entities as they become available.

### JURISDICTION AND VENUE

54.    This Court has federal subject matter jurisdiction of the federal RICO claims (18 U.S.C. § 1962(c) and (18 U.S.C. § 1962(d)) as federal questions pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 (a) and (c).  This Court has federal subject matter jurisdiction of the Computer Fraud and Abuse Act claims (18 U.S.C. § 1030) pursuant to 28 U.S.C. § 1331.  This Court has diversity

jurisdiction pursuant to 28 U.S.C. § 1332 because (a) this action is between citizens of different states and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367(a).

55.    Venue for this action lies in this judicial district and division pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. §1965.

## FACTS

**A.    Tiversa's Business Model**

56.    In 2004, Boback, a chiropractor, and Hopkins, a high school dropout, started Tiversa as a technology company in Pittsburgh, Pennsylvania.

57.    When Tiversa began, it targeted the music and video industries with new services that, according to Tiversa, would combat the ever-increasing problem of copyright infringement by computer users using peer-to-peer software ("P2P software") on peer-to-peer networks ("P2P networks") on the internet.

58.    Tiversa's services were based on Tiversa's proprietary technologies (the "Tiversa Technologies") that allegedly gave Tiversa the ability to (1) monitor and record *all* searching and downloading of *all* music, video and other files across *all* P2P networks *all* over the world by *all* P2P network users, (2) capture

20

the IP addresses[1] of the infringers' computers and (3) seize copies of the illegally downloaded files from the infringers' computers for use as evidence or otherwise.

59.    Tiversa had only limited success with the recording industry. But Boback and Hopkins had other plans. They knew Tiversa could use its Technologies to access the hard drives of thousands of computers on P2P networks everywhere to access, download, view and store all types of files without anyone's knowledge, permission or authority, including files that contained private, confidential and even classified information.

60.    Boback and Hopkins decided Tiversa would become a "cybersecurity" company that would convert its victims into customers by selling them services to remedy the very security "breaches" Tiversa concocted.

61.    There are four core steps in Tiversa's business model ("Tiversa's Business Model"):

- Step 1 - Tiversa *steals* Private, Confidential and Classified Files;

- Step 2 - Tiversa *lies* to its targets about the source of the Private and Confidential Files;

- Step 3 – Tiversa *threatens* to report reluctant targets to law enforcement authorities; and

---

[1] An IP address is a unique string of numbers separated by periods that identifies each computer using the Internet Protocol to communicate over a network.

- Step 4 - Tiversa *retaliates* against targets that refuse to hire Tiversa.

**1.    Step 1 - Steal**

62.    Tiversa utilizes its Technologies and expertise to surreptitiously take Private, Confidential and Classified Files from computers on the internet without authority or permission.

a.    **Tiversa's Technologies**

63.    Peers (*i.e.*, computers) on P2P networks are called nodes.  Tiversa's Technologies utilize a combination of components in P2P networks known as true nodes and "pseudonodes."  Pseudonodes, also known as "rogue" nodes and "fake" nodes, are nodes that can be configured to trick P2P networks in a variety of ways, some of which are quite nefarious.  For example, according to Tiversa's patents,[2] a Tiversa pseudonode can be configured to:

- connect to thousands of true network nodes on multiple networks (as opposed to actual network nodes which are limited to one to ten connections);

- detect, store and manage the IP and network addresses of the true network nodes to which it is connected;

- record search requests initiated by others, to capture the responding information and to intercept a copy of files requested by others;

---

[2] *See, e.g.,* U.S. Patent Nos. 8,819,237 B2, 8,468,250 B2, 8,386,613 B2, 8,312,080 B2, 8,156,175 B2, 8,122,133 B2, 8,037,176 B2, 7,783,749 B2 and 7,761,569 B2.

- impersonate a true network nodes;

- impersonate multiple true network nodes;

- dynamically change its IP address to a fake or real IP address;

- falsify its client ID;

- falsify its GUID;

- use a configured list of fake addresses or a single fake address generated at random. If an address does not actually appear on a network, a Tiversa pseudonode can make it appear as though it does;

- generate and send false search responses, each with a different IP address and client ID to make it appear that the requested information has spread to multiple nodes;

- generate and send false search responses that contain random filenames and file sizes from random network nodes;

- generate and send false search responses that contain the same file with different file sizes;

- accept a search request from a true network node and replace the search string with a random set of falsified numbers and characters but keep the same message ID;

- eliminate searches from the network;

- send a response that causes the originator of the search to cease to function or severely limit its operation;

- respond to searches with incorrect information; and

- generate and send a false response that fills a user's monitor with irrelevant information.

### (i)    Theft

64.    Tiversa's Technologies allow Tiversa to intercept and steal files being sent from one computer to another on P2P networks.

65.    Tiversa's use of its Technologies to search for, take, download, view, store and transfer files without authority or permission violates, among other criminal statutes, 18 U.S.C. § 793 (Espionage Act - Unlawful Gathering and Transmitting of Defense Information), 18 U.S.C. § 798 (Espionage Act - Illegal Disclosure of Classified Information), 18 U.S.C. § 1028 (Identity Fraud), 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. §§ 1462, 1466A(b), 2252, 2252A (Illegal Transfer and Possession of Obscene Material), 18 U.S.C. § 1924 (Unlawful Removal and Retention of Classified Information), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C § 1832 (Economic Espionage Act - Theft of Trade Secrets), 18 U.S.C. § 2252A (Child Pornography), 18 U.S.C. § 2314 (National Stolen Property Act), 18 U.S.C. § 2319 (Criminal Infringement of a Copyright), 18 U.S.C. § 2511 (Interception and Disclosure of Electronic Communications), 18 U.S.C. § 2701 (Unlawful Access to Stored Communications), 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of

Personal Health Information), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-9-121 (Identity Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).

### (ii)    Fraud

66.    Tiversa's Technologies allow Tiversa to trick and confuse computers on P2P networks in a variety of ways including, without limitation, disguising itself, hiding itself and even impersonating other computers on these networks.

67.    This tricking and confusing of computers violates, among other criminal statutes, 18 U.S.C. § 1028 (Identity Fraud), 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2511 (Interception and Disclosure of Electronic Communications), 18 U.S.C. § 2701 (Unlawful Access to Stored Communications), O.C.G.A. § 16-9-93 (Computer Crimes) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).

### (iii)    Interference

68.    Tiversa's Technologies allow Tiversa to interfere with the normal transmission of IP addresses, network information and files from one computer to another on P2P networks in a variety of ways including, without limitation, eliminating computer users' search requests from the network, sending responses

that cause the originator of the search to cease to function or severely limit its operation and respond to others' search requests with false and irrelevant information.

69.   This data transmission interference violates, among other criminal statutes, 18 U.S.C. § 2511 (Interception and Disclosure of Electronic Communications).

### (iv)   Espionage

70.   Tiversa's Technologies allow Tiversa to spy on unsuspecting users of P2P networks in a variety of ways including, without limitation, capturing search requests, IP addresses, network addresses and data files sent from one computer to another on P2P networks.

71.   This espionage violates, among other criminal statutes, 18 U.S.C. § 793 (Espionage Act - Unlawful Gathering and Transmitting of Defense Information), 18 U.S.C. § 798 (Espionage Act - Illegal Disclosure of Classified Information), 18 U.S.C. § 1028 (Identity Fraud), 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1924 (Unlawful Removal and Retention of Classified Information), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C § 1832 (Economic Espionage Act - Theft of Trade Secrets), 18 U.S.C. §

2511 (Interception and Disclosure of Electronic Communications), 18 U.S.C. § 2701 (Unlawful Access to Stored Communications), O.C.G.A. § 16-9-93 (Computer Crimes) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).

### (v)    Data Manipulation

72.    Tiversa's Technologies allow Tiversa to generate and send on P2P networks false search responses with different IP addresses and client IDs to make it appear that the requested information has spread to multiple computers on P2P networks.

73.    This data manipulation violates, among other criminal statutes, 18 U.S.C. § 793 (Espionage Act - Unlawful Gathering and Transmitting of Defense Information), 18 U.S.C. § 798 (Espionage Act - Illegal Disclosure of Classified Information), 18 U.S.C. § 1028 (Identity Fraud), 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1924 (Unlawful Removal and Retention of Classified Information), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C § 1832 (Economic Espionage Act  - Theft of Trade Secrets), 18 U.S.C. § 2511 (Interception and Disclosure of Electronic Communications), 18 U.S.C. § 2701 (Unlawful Access to Stored Communications), O.C.G.A. § 16-9-93 (Computer Crimes) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).

b.    **Private Files**

74.    Examples of private files ("Private Files") taken by Tiversa without permission or authority include, but are not limited to, personal and private information and documents such as individual tax returns, credit reports, credit card numbers and cards, bank card statements, birth certificates, passports, medical records (including psychiatric records), social security numbers and cards, drivers license numbers, employment applications, user ids and passwords (*e.g.*, online banking and brokerage accounts), health insurance cards, mortgage applications, physical threat assessments, bank account applications, wire transfer authorizations, wills, trusts, life insurance applications, soldiers' names and social security numbers, salaries, credit card numbers, passwords, financial accounts, investment accounts and banking statements.  Private Files also include, but are not limited to, information and documentation covered by 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information) and various state laws regarding the unlawful taking, possession and use of Personal Identifying Information, including, without limitation, Ariz. Rev. Stat. Ann. §13-2008; Colo. Rev. Stat. §18-5-903.5, 904 and 905; Fla. Stat. §817.5685; Hawaii Rev. Stat. §708-839.55; La. Rev. Stat. Ann. §14:70.7; Nev. Rev. Stat. §205.465; N.Y. Penal

Law §190.81, .82 and .83; and Or. Rev. Stat. §165.810; Tex. Penal Code Ann. §32.51; Utah Code Ann. §76-6-1105.

c.    **Confidential Files**

75.    Examples of confidential files ("Confidential Files") taken by Tiversa without permission or authority include, but are not limited to, confidential, privileged and trade secret information and documents related to corporate executives, corporate operations, corporate financials, sales, legal matters, wire transfer authorizations, employment records, product launch plans, RFPs and RFQs (including highly sensitive corporate plans), documents prepared in anticipation of litigation, attorney-client privileged material, drafts of major corporate announcements, merger and acquisition plans (including amounts companies are willing to pay), customer lists, customer bank statements, records of financial performance, administrative passwords and user IDs to private corporate networks, employee performance evaluations, physical security audits showing vulnerabilities, employee itineraries, corporate strategies of Fortune 500 companies, minutes of board meetings, payrolls, corporate tax records, network diagrams, router access codes, foreign exchange system design documents, clinical drug testing before FDA approval, confidential corporate accounting documents, building blue prints and floor plans, encryption keys, bank material marked

"confidential," customer account lists and competitively sensitive information. Confidential Files also include, but are not limited to, information and documentation covered by 18 U.S.C § 1832 (Economic Espionage Act - Theft of Trade Secrets) and 18 U.S.C. § 2319 (Criminal Infringement of a Copyright).

      d.   **Classified Files**

76.    Examples of classified files ("Classified Files") taken by Tiversa without permission or authority include, but are not limited to, classified information and documents relating to the Federal Bureau of Investigation (including, for example, surveillance photos of an alleged Mafia hit man that were "leaked" while he was on trial), the National Security Administration, military personnel, physical threat assessments, military information security systems audits, Pentagon server, router and IP information, confidential information on troops (including social security numbers and addresses), the President's helicopter Marine One, safe houses, contractors' IT systems, classified information from multiple foreign governments (including allies), files with information regarding the United States Government generally and the Department of Defense and various United States Armed Forces, government emergency response plans and military operations as well as information that has been determined by the United States Government pursuant to an Executive order

or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations. Classified Files also include, but are not limited to, information and documentation covered by 18 U.S.C. § 793 (Espionage Act Violation - Unlawful Gathering and Transmitting of Defense Information), 18 U.S.C. § 798 (Espionage Act Violation - Illegal Disclosure of Classified Information) and 18 U.S.C. § 1924 (Unlawful Removal and Retention of Classified Information).

### 2. Step 2 - Lie

#### a. The Publicly Available Lie

77. Tiversa consistently, systematically and regularly makes the false, fraudulent and defamatory statement that the Private and Confidential Files it "finds" on P2P networks are "publicly available" at the time Tiversa "finds" them, reviews them and downloads them into its database. This lie is referred to herein as the "Publicly Available Lie."

78. Tiversa has regularly, consistently, systematically and convincingly told and advanced the Publicly Available Lie to fraudulently conceal the fact that, in truth, Tiversa actually steals Private and Confidential Files directly from the

computers of file owners[3] who have not given Tiversa authority or permission to access, view, download, store or distribute their files.

79.    On the few occasions where people questioned Tiversa's claims of finding Private and Confidential Files "out there" on P2P networks, Boback would exclaim to other Tiversa employees, "Go ahead and try to prove me wrong."  Boback said this because he believed that no one outside of Tiversa had the technological or other means to disprove Tiversa's false, fraudulent and defamatory claims and because Tiversa had falsified evidence of source, disclosure and spread.

### b.    **Fraud Re: Source**

80.    Tiversa consistently, systematically and regularly makes the false, fraudulent and defamatory statement that the Private and Confidential Files it "finds" on P2P networks are found on computers *other* than those of the file owners.  This lie is referred to herein as a "Fraudulent Statement Regarding Source."

### c.    **Fraud Re: Disclosure**

81.    Tiversa consistently, systematically and regularly makes the false, fraudulent and defamatory statement that file owners made their Private and

---

[3] "File owners," as used herein, include those who have a right to possess Private, Confidential and/or Classified Files.

Confidential Files publicly available on P2P networks when, in fact, virtually none of the owners of the Private and Confidential Files taken by Tiversa ever chose to release such files to the public. This lie is referred to herein as a "Fraudulent Statement Regarding Disclosure."

### d.    Fraud Re: Spread

82.    Tiversa consistently, systematically and regularly makes the false, fraudulent and defamatory statement that Private and Confidential Files have proliferated to one or more other computers on P2P networks. This lie is referred to herein as a "Fraudulent Statement Regarding Spread."

### e.    Fraud Re: Bad Actors

83.    Tiversa consistently, systematically and regularly makes the false, fraudulent and defamatory statement that while searching P2P networks, Tiversa "finds" the Private and Confidential Files of others on computers of identity thieves and other bad actors. This lie is referred to herein as a "Fraudulent Statement Regarding Bad Actors."

84.    Tiversa supports the Publicly Available Lie and Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors by manipulating data in its database (including metadata on the files it steals) to make it appear that Tiversa has located files on computers of identity thieves and other

bad actors. This falsification has been especially convincing. Until recently, Boback and others at Tiversa have been supremely confident that no one could ever *disprove* the falsified source information in Tiversa's database.

### 3. Step 3 - Threaten

85. Tiversa and certain staff members of the Federal Trade Commission began working together in 2007 on the topic of data "leaks" on P2P networks.

86. Boback believed Tiversa could capitalize on its newfound arrangement with the FTC by reporting to the FTC companies that refused Tiversa's services, the expected result of which was that (1) those companies would respond to FTC inquiries by hiring Tiversa or (2) Tiversa would exact revenge on those companies for not hiring Tiversa in the first place.

87. The FTC intended to capitalize on its relationship with Tiversa by getting information from Tiversa to identify targets for investigations and prosecutions and by using evidence obtained from Tiversa to support those investigations and prosecutions.

88. The relationship between Tiversa and the FTC was and remains highly irregular, so much so that the House Oversight and Government Reform Committee made the following findings after an investigation of Tiversa and its relationship with the FTC:

> [I]t is clear that Tiversa and the FTC had a mutually beneficial relationship. The FTC used Tiversa as the source of convenient information used to initiate enforcement actions, and Tiversa used the FTC to [sic] in further pursuing the company's coercive business practices.

Staff Of Comm. On Oversight & Gov't Reform, 113th Cong., Tiversa, Inc.: White Knight Or High-Tech Protection Racket? 67 (2015) (Prepared for Chairman Darrell E. Issa) (the "OGR Report"). A true and correct copy of the OGR Report is attached hereto, marked as Exhibit A and incorporated herein by reference.

89. In 2008 and 2009, Tiversa compiled a hit list of approximately ninety (90) companies that initially refused Tiversa's services after Tiversa made false claims that it had located the companies' Private and Confidential Files because they were "publicly available" on P2P networks (the "List"). A true and correct copy of the List is attached hereto, marked as Exhibit B and incorporated herein by reference.

90. Tiversa threatened to report to the FTC some or all of the companies on the List before adding those companies to the List.

91. Other examples of Tiversa's threats, intimidation and fearmongering tactics are identified in the OGR Report at pp. 18-25, 39-42 and 88-98.

4.     **Step 4 – Retaliate**

a.     **The List**

92.     Tiversa's specific purpose for collecting documents and gathering information on companies that would be placed on the List was two-fold: (1) to create incentives for those companies to engage Tiversa after they received warning letters from the FTC, and (2) to retaliate against those companies for not engaging Tiversa's services in response to Tiversa's solicitations.

93.     In 2009, when FTC investigators asked Tiversa for the List and supporting documents, Tiversa became concerned about public disclosure of this aspect of its relationship with the FTC.

b.     **The Privacy Institute**

94.     To resolve Tiversa's concern, the FTC investigators along with Tiversa, Boback, Kline, Morgan Lewis and Tarquinio agreed that (1) Tiversa would create a shell company, (2) the FTC investigators would serve a civil investigative demand on the shell company rather than on Tiversa, (3) Tiversa, Kline, Morgan Lewis and Tarquinio would produce the List and other documents to the FTC investigators under the pretense that those items were being produced by the shell company, and (4) the FTC investigators, Tiversa, Kline, Morgan

Lewis and Tarquinio would keep the identity and purpose of the shell company a secret.

95.    On June 3, 2009, at Tiversa's direction and on Tiversa's behalf, Kline, Morgan Lewis and Tarquinio incorporated a company known as The Privacy Institute as a *Delaware* corporation rather than a *Pennsylvania* corporation.

96.    Boback, Tiversa, Kline, Tarquinio and Morgan Lewis set up The Privacy Institute in a surreptitious fashion to avoid any connection with Tiversa. For example, as shown in documents on file with the Secretary of State of Delaware:

- Neither Tiversa nor Boback nor any affiliated entity's name is found anywhere in the incorporation documents;

- The company was organized as a non-profit corporation;

- The stated purpose of the company included, but was not limited to, "pursuing regulatory, legislative and judicial activities in furtherance of individual privacy rights;"

- Boback, Tiversa, Kline and Morgan Lewis selected one of Boback's friends, Brian J. Tarquinio, to be the only director and officer of the company;

- They selected 1 Regency Court, Marlton, NJ, 08053, as the company's address.  This address is for James Kelley, Boback's uncle;

- They listed David M. Speers as the incorporator;

- They listed Speers' address as 1701 Market St., Philadelphia, PA 19103; and

- They did not reveal that Speers was a paralegal employed by Morgan Lewis.

97.    In August of 2009, Tiversa followed through on its threats to LabMD and other companies by turning the List over to the FTC.  The FTC thereafter opened investigations on and prosecuted many companies on the List, including LabMD.

98.    Other examples of Tiversa's retaliations are identified in the OGR Report at pp. 18-25, 27, 53 and 88-98, and in *In re LabMD Inc.*, 2015 FTC LEXIS 272 (F.T.C. Nov. 13, 2015) (the "Initial Decision"), pp. 19 and 70.  A true and correct copy of the Initial Decision is attached hereto, marked as Exhibit C and incorporated herein by reference.

**B.    Conspiracy**

    **1.    Conspirators**

        a.    **Kline, Morgan Lewis and Tarquinio**

99.    Kline and Boback have known each other and done business together since before Tiversa began operations in or about January 2004.

100.    Kline and Morgan Lewis began providing legal services to Tiversa and Boback in or about January 2004.

101.   Kline and Morgan Lewis served as Tiversa's outside general counsel from Tiversa's inception until Kline left Morgan Lewis in or about October 2013.

102.   Kline and Morgan Lewis gave legal advice and otherwise helped in the management and operations of Tiversa by helping Tiversa develop Tiversa's board of directors, advisory board and each step of Tiversa's Business Model set forth above.

103.   Legal advice and services provided by Kline and Morgan Lewis helped Boback and others manage and operate Tiversa, especially to effectuate the Tiversa Business Model.

104.   Kline and Morgan Lewis not only created but also represented The Privacy Institute as outside counsel from its inception on June 3, 2009, until its dissolution on June 24, 2013.

105.   Tarquinio, a longtime friend of Boback, was the president, secretary and treasurer of The Privacy Institute.

106.   Kline and Morgan Lewis represented The Privacy Institute in July of 2009, when it was served and Tiversa responded to a civil investigative demand (the "First Subpoena") "served" on The Privacy Institute by the FTC.

107.   The First Subpoena directed The Privacy Institute to produce documents with a sworn certificate (the "Certificate") stating as follows:

I/We do certify that all of the documents required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

108. On or about August 18, 2009, a representative of Tiversa signed and mailed the Certificate to the FTC along with several documents ostensibly responsive to the First Subpoena.

109. The Certificate is false and fraudulent because (1) the Privacy Institute was a sham corporation established to conceal Tiversa's frauds, (2) Tiversa and The Privacy Institute knowingly refused to produce to the FTC a large number of documents, including documents that were exculpatory to LabMD and other companies on the List, (3) documents sent to the FTC contained false and fraudulent information prepared and sent by Tiversa with the hope and expectation that the FTC would rely upon the fraudulent information as a basis for investigating and eventually prosecuting companies on the List and (4) Tiversa's response was in furtherance of earlier fraudulent statements it had made to the FTC that the files identified on the List were publicly available when, in fact, (1) Tiversa had taken the files from the file owner's computers without authority or permission from the file owners and (2) Tiversa knew that the files had never "leaked" anywhere.

110.   On information and belief, Kline, Morgan Lewis and Tarquinio reviewed and were fully aware of the Certificate, the List and the contents of all documents produced to the FTC in response to the First Subpoena.    On information and belief, Kline, Morgan Lewis and Tarquinio encouraged and/or enabled Tiversa and The Privacy Institute to respond in the fashion set forth above.

### b.    Clark, Schmidt and Ponemon

111.   In and around 2006, Tiversa, Boback, Adams, Kline and Morgan Lewis created an advisory board for Tiversa.   The advisory board included Defendants Clark, Schmidt, Ponemon and others who were picked to help Tiversa succeed largely because of their reputations, expertise and connections.

112.   Tiversa gave Clark, Schmidt and Ponemon equity shares in Tiversa to incentivize these individuals to generate business for and otherwise promote Tiversa.  In exchange, Clark, Schmidt and Ponemon agreed to make introductions and referrals and generally promote Tiversa.

113.   As members of Tiversa's advisory board, Clark, Schmidt, and/or Ponemon began meeting with Tiversa in or around January 2006.

114.   Over the next few years, Clark, Schmidt and Ponemon interacted and participated with Tiversa to help implement Tiversa's Business Model. Clark,

Schmidt and Ponemon often walked out of their meetings with Boback, Adams and others with "to do" lists.

115.   Schmidt introduced Tiversa and Boback to many potential clients and media contacts including, for example, Merrill Lynch, PayPal, MSNBC and the FAA.

116.   As shown in the following article dated June 26, 2006, and published at http://www.pcworld.com/article/126230/article.html, Schmidt publicly promoted Tiversa:

> PALO ALTO, CALIFORNIA -- Users of peer-to-peer file-sharing services may be sharing more than they bargained for, a former White House cybersecurity advisor warned last week.
>
> Security researchers have found thousands of files with sensitive information by searching through file-sharing networks, said Howard Schmidt, chief executive officer at R&H Security Consulting. Schmidt, who has also worked as chief security officer for Microsoft, made the comments during an SDForum seminar in Palo Alto, California, last week.
>
> Medical records, financial information, and router passwords have all popped up on P-to-P networks, often after users inadvertently share folders containing the data. "People don't realize you're not just sharing your music," Schmidt said. "You're sharing your personal files."
>
> Millions of U.S. households still use P-to-P services, though the practice of illegally downloading music from these services has been on the decline, according to the NPD Group research firm.
>
> And with all of those possible victims, criminals see an opportunity to search these networks for sensitive information, Schmidt said. "These are real live search strings the bad guys are using: bank such-and-such statement for

August, bank such-and-such May statement, account summaries, account stop payment, Internet scams, bank routing information," he said.

Some of the P-to-P searches have been more ominous, he added. "We've actually found people out there searching for how to make sarin gas."

Tiversa, a security company in Wexford, Pennsylvania, conducted the research. Schmidt is an advisor to Tiversa.

Hackers have already evolved sophisticated techniques for using Google's search engine to unearth data that has accidentally been exposed on Web sites. But with P-to-P hacking, attackers can get access to data on a victim's desktop.

"You can set something up for an hour, search for it, and you're gone," Schmidt said. He estimates that there are nearly four times as many P-to-P searches conducted each day as there are Google searches.

Ironically, a U.S. law enacted to help fight identity theft may be helping the bad guys.

The Fair Credit Reporting Act allows U.S. consumers to request a free credit report once every 12 months, but some P-to-P users are inadvertently sharing this information, Schmidt said. "They will go to the [free credit report] Web site, do all the validations necessary, download it on their desktop," he said. "Well what does it contain? ... Some of them have full date of birth and all this other stuff: your credit cards, places you've lived, spouses' names, and on and on."

Medical records are another source of concern. Researchers found one physician accidentally sharing 97 files with patient data on them, Schmidt said. "I don't think if I was his patient, I would want this information out on any network, let alone a peer to peer network.

117. In an article dated November 22, 2006, and published at

http://www.computerweekly.com/news/2240079135/Smaller-business-must-do-

more-on-security-warns-Schmidt, Schmidt promoted Tiversa's business by hyping

the dangers of inadvertent file sharing:

> **Small and medium-sized businesses need to take more action to ensure the security of their IT systems, experts have warned.**
>
> Former White House and Microsoft chief security officer Howard Schmidt told a seminar organized by internet service provider Claranet, "SMEs have to realize that just because they are small, it doesn't mean they won't be targeted. Bad guys target wherever they can get money."
>
> But SMEs were struggling to cope with internet threats, Schmidt said.
>
> "Large enterprises have been doing a good job in preventing security breaches. But small businesses normally don't have full-time IT staff."
>
> Even SMEs with workforces of around 30 people often did not have their own IT and security professionals, leaving them unable to properly address security threats, Schmidt added.
>
> He warned that human error – and the ignorance of staff – was often to blame for important or sensitive data being compromised. He highlighted the danger of staff using file-sharing software or networks inadvertently making company data available to others. "Individuals working on peer-to-peer networks often don't realize they're sharing the whole contents of their drive," he said.

118. Ponemon and his organization, The Ponemon Institute, promoted

Tiversa on numerous occasions.

119. On April 22, 2008, Ponemon, The Ponemon Institute and Tiversa

published a report (the "Ponemon's Crisis Report," which may be found at

http://www.marketwired.com/press-release/ponemon-institute-study-exposes-

dangers-peer-peer-networking-enterprise-data-security-846827.htm)          wherein

Ponemon described the "crisis" Tiversa was allegedly addressing as follows:

> What if you knew that sensitive and confidential documents about your
> organization were publicly available on the Internet? What if you knew that
> trusted employees, vendors, partners and even customers were leaking these
> documents on the Internet? What would you do if you learned that criminals,
> the media, competitors and foreign governments were accessing and using
> your most sensitive documents and profiting from them?

> This is precisely what is happening on Peer-to-Peer or P2P file-sharing
> networks today. Beginning with Napster, which enables users to share music
> and music, P2P file-sharing networks have grown explosively over the past
> nine years. Today over 450 million people have access to these networks and
> make more than 1.5 billion requests for files per day. That is almost 10 times
> more than what Google processes for the World-wide Web.

> Unfortunately, when users put software on their computers to share music
> and movies, they can easily share their whole hard drive and all its contents.
> At the same time, P2P's ease of use has lowered the skills needed for
> criminals to access the contents of these exposed hard drives. No longer is
> there a need to hack or phish – just issue a search for "credit card," "audit"
> or "medical records" and the files of auditors, attorneys, physicians,
> executives, or home users can be found without the victims' knowledge.

> What this means is that every day the leakage of sensitive documents occurs
> and no commercial or government organization is fully immune despite
> current IT measures. In one well-publicized case, an employee at a global
> pharmaceutical company downloaded unauthorized file sharing software on
> a corporate laptop and caused the disclosure of Social Security numbers and
> personal data of 17,000 current and former employees. In another incident, a
> TV reporter used a widely used P2P file sharing program to obtain a
> confidential document discussing a terrorist threat on Chicago and 34 other
> cities. The maliciousness of this practice for monetary gain is exemplified by
> the arrest and conviction of a Seattle man for ID theft and fraud using P2P
> file sharing networks to obtain his victims' information.

Sponsored by Tiversa, Ponemon Institute conducted this study, *The Ignored Crisis in Data Security: P2P File Sharing*, to better understand the level of awareness among IT security practitioners about the risks posed by P2P file-sharing applications that reside on workplace, remote and home computers. What was learned is that IT security practitioners seem to be only partially aware of or underestimate the risk, despite high profile cases that have illustrated the impact of disclosing even one file. It is also difficult to understand why this crisis goes ignored when 76% of IT security practitioners in our study admit that their organization has had a data breach involving the loss or theft of confidential information over the Internet.

120. In a March 4, 2009 TribLive article published at http://triblive.com/x/pittsburghtrib/news/s_614319.html, Ponemon hyped Tiversa with the following statement, "I'm 99.9 percent sure that Tiversa is the only game in town. They're pretty unique in what they do, and how they do it." According to that article:

Ponemon now sits on Tiversa's advisory board after being so impressed with the company's technology, he asked to join. Media coverage of Tiversa grew after the company alerted the federal government Feb. 25 that someone in Iran had shared a file on potentially sensitive data about a helicopter in President Obama's fleet, said Keith Tagliaferri, director of operations for Tiversa.

121. Clark promoted Tiversa on many occasions and in many forums including solicitation of business from potential Tiversa customers at the Masters Golf Tournament in Augusta, Georgia in April 2009.

122. Clark introduced Tiversa and Boback to various federal agencies, Congress and representatives of the Armed Forces.

46

123.   Clark, along with Boback, testified on July 24, 2007, at a hearing before the House of Representatives Committee on Oversight and Government Reform on the topic of Inadvertent File Sharing Over Peer-to-Peer Networks. Clark's knowledge of and participation in Tiversa's illegal taking of Classified Information is shown in his testimony as follows:

> General Clark: Good morning, Mr. Chairman and Ranking Member Davis, distinguished members of the committee. It is an honor to come before you today to talk about a topic that is critical to our national security and the safety and privacy of our Nation's citizens and companies. I want to commend Congressman Waxman and Congressman Davis and members of the committee for both bringing this issue back to light and for the work this committee has done previously to try to highlight the risk.

> I want to just disclose now that I am an advisor to Tiversa, and in that role I do have a small equity stake in Tiversa. But my engagement here has just opened my eyes to activities that I think, if you saw the scope of the risk, I think you would agree that it is just totally unacceptable. The American people would be outraged if they were aware of what is inadvertently shared by Government agencies on P2P networks. They would demand solutions.

> Now, Bob Boback has just explained what is out there on the corporate side. I have submitted some material for the record. Let me just summarize quickly what we found.

> As I was preparing for the testimony, I asked Mr. Boback to search for anything marked classified secret, or secret no-foreign. So he pulled up over 200 classified documents in a few hours running his search engine. These documents were everything from in sums of what is going on in Iraq to contractor data on radio frequency information to defeat improvised explosive devices. This material was all secret, it was all legitimate.

> I called the chairman of the National Intelligence Advisory Board, who worked for Admiral McConnell, and shipped the information to him. He

looked at it. He called NSA. NSA has it. They are now very seized with the problem, I think. But I think that the work of this committee has been a great assist in getting the agencies to look at this, because previously there have been contacts but we never have sort of engaged.

As the chairman of the Advisory Committee told me when he looked at the documents, he said, my goodness, they are in full color. Yes, they are the complete documents. They are not faxed copies, they are not smudged. They are just as fresh as if they were printed off on the computer printer of the organization.

Even more alarming, I got a call from Bob Boback on Wednesday night that he had found on the peer-to-peer net the entire Pentagon's secret backbone network infrastructure diagram, including the server and IP addresses, with password transcripts for Pentagon's secret network servers, the Department of Defense employees' contact information, secure sockets layer instructions, and certificates allowing access to the disclosing contractors' IT systems, and ironically, a letter from OMB which explicitly talks about the risks associated with P2P file-sharing networks.

So I called the Office of the Secretary of Defense. I got the right people involved. They had some meetings on it this. It turns out that a woman with top secret clearance working for a contractor on her home computer, she did have LimeWire, and somehow, I guess, she had taken some material home to work on it, and so all this was out there.

This material was not, strictly speaking, secret. It was, I think, labeled FOUO. But it was certainly information that would be sort of a hacker's dream.

What we found at Tiversa was that many people were queued up to download this information. This looked so interesting that they wanted it. So we don't know how long it had been out there. There is no way of knowing that. But we called the company an obviously we got it stopped as soon as we found out about it.

But these two examples illustrate the risks that are out there.  Peer-to-peer file sharing is a wonderful tool. It is going to be a continuing part of the

economy. It is a way that successfully moves large volumes of data, and that is not going to go away, but it has to be regulated and people have to be warned about the risks, and especially our Government agencies—our National Security Agency, DOD, people that run the Sipranet—have to take the appropriate precautions, because we can't have this kind of information bleeding out over the peer-to-peer network.

Thank you, Mr. Chairman.

124.   As revealed in his testimony above, Clark violated and conspired with Tiversa and Boback to violate 18 U.S.C. § 793 (Unlawful Gathering and Transmitting of Defense Information) and 18 U.S.C. § 798 (Illegal Disclosure of Classified Information) when he directed Boback "to search for anything marked classified secret" and when Boback complied with his request.

### c.    Adams, Becker, Chopra, Hopkins, Kopchak and Tagliaferri

125.   Adams owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

126.   Adams currently serves and/or, during relevant times, has served as a member of Tiversa's board of directors.

127.   Becker owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

128.   Becker has served as Tiversa's chief financial officer.

129.   Becker currently serves and/or, during relevant times, has served as a member of Tiversa's board of directors.

130.    Becker currently serves and/or, during relevant times, has served as a member of Tiversa's advisory board.

131.    Chopra owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities she controls.

132.    Chopra is or has served as Tiversa's chief information officer.

133.    Hopkins is or has served as Tiversa's chief technology officer.

134.    Hopkins owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

135.    Hopkins currently serves and/or, during relevant times, has served as a member of Tiversa's board of directors.

136.    Kopchak owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

137.    Kopchak is or has served as Tiversa's chief financial officer.

138.    Tagliaferri owns or, during relevant times, has owned shares of Tiversa either directly or through one or more entities he controls.

139.    Tagliaferri is or has served as Tiversa's chief operations officer.

140.    Allegations regarding the participation, conspiracy, enabling, aiding and abetting of Defendants Adams, Becker, Chopra, Hopkins, Kopchak and

Tagliaferri are set forth elsewhere in this Complaint and are incorporated herein by reference.

### d.    **Johnson and Dartmouth**

141.    Allegations regarding the participation, conspiracy, enabling, aiding and abetting of Defendants Johnson and Dartmouth College are set forth elsewhere in this Complaint and are incorporated herein by reference.

### e.    **Kline, Hansberry and Pepper Hamilton**

142.    Allegations regarding the participation, conspiracy, enabling, aiding and abetting of Defendants Hansberry, Kline and Pepper Hamilton are set forth elsewhere in this Complaint and are incorporated herein by reference.

### 2.    **Objective**

143.    The overall objective of the Defendants' conspiracy was for Tiversa to use Tiversa's Technologies to search for and take files from computers all over the world, without the file owners' knowledge or permission, and then either (1) dupe the file owners and others into paying for services they do not need by falsely claiming the files Tiversa took from the file owners' computers were "publicly available" and are/may be spreading without control throughout cyberspace or (2) threaten and retaliate against the file owners who would not hire Tiversa.

### 3.    Implementation

144.  On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio know and have advised Tiversa since their earliest involvements with Tiversa that, because it would be illegal to do so, Tiversa should never admit to accessing, reviewing, downloading, storing or transferring Private or Confidential Files directly from the computers of the owners of those files.   On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio have participated in, encouraged and/or enabled Tiversa to keep such information quiet.

145.  On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio know and have known since their earliest involvements with Tiversa that Tiversa regularly conceals its illegal taking of Private and Confidential Files.  On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins,

Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio have participated in, encouraged and/or enabled these practices.

146. On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio know and have known since their earliest involvements with Tiversa that after Tiversa illegally takes Private and Confidential Files, it regularly tells the Publicly Available Lie and makes Fraudulent Statements Regarding Disclosure, Source, Spread and Bad Actors to the owners of those files in order to generate revenue from its illegal practices. On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio have participated in, encouraged and/or enabled these practices.

147. On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio know and have known since their earliest involvements with Tiversa that when Tiversa contacts companies to sell services, Tiversa's practice is to (1) explain that, because of a security breach, it found one or more of the company's files on a P2P network, (2)

explain that the file or files contain private or confidential information, (3) not reveal the true source of the information, (4) tell the potential customer that Tiversa did not record the IP information and (5) offer its services to fix the potential customer's alleged problem.  On information and belief, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio have participated in, encouraged and/or enabled these practices.

148.   On information and belief, despite their knowledge of Tiversa's illegal practices, Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio continued advising and profiting from Tiversa because they believed no one could disprove the Publicly Available Lie or Tiversa's Fraudulent Statements Regarding Disclosure, Source, Spread and Bad Actors because no one had Tiversa's Technologies.

149.  Adams, Becker, Chopra, Clark, Dartmouth, Johnson, Hansberry, Hopkins, Kline, Kopchak, Morgan Lewis, Pepper Hamilton, Ponemon, Schmidt, Tagliaferri and Tarquinio's conduct violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1512 (Witness Tampering), 18

U.S.C. § 1513 (Witness Retaliation), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-93 (Witness Tampering), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

## C.    Tiversa Targets LabMD

### 1.    Step 1 - Steal

150.    In February 2008, Tiversa accessed (*i.e.,* hacked[4]) computer files stored on a LabMD computer in Atlanta, Georgia.

151.    Tiversa recorded the IP address and port of the LabMD computer it hacked.

152.    One of the files Tiversa hacked was a Private File.  Specifically, Tiversa hacked directly from LabMD's computer in February 2008, in Atlanta, Georgia, a 1,718-page PDF document containing Personal Identifying Information

---

[4] According to Black's Law Dictionary (10th Edition), "hack" means "to surreptitiously break into the computer, network, or database of another person or organization."

and Personal Health Information on approximately 9,300 patients (the "1718 File").

153. Tiversa hacked the 1718 File by, *inter alia*, instructing its computer in Pittsburgh to target and utilize the "push" feature of software on LabMD's computer to capture and push the 1718 File through LabMD's firewall in Atlanta, Georgia to Tiversa's computer in Pittsburgh.

154. After the 1718 File was "pushed" from LabMD's computer to Tiversa's computer in Pittsburgh, Tiversa then viewed and stored the 1718 File.

155. Tiversa did not have authority or permission from either LabMD or any one of the 9,300 patients listed in the 1718 File to access, view, download or store that file.

156. After Tiversa downloaded and viewed the 1718 File, it then instructed its computer in Pittsburgh to target and utilize the "browse host" feature of software on LabMD's computer to learn that eighteen (18) other files could be taken from the LabMD computer. Tiversa targeted the LabMD computer for more files because Tiversa was particularly interested in obtaining medical files and knew that LabMD was a medical testing facility.

157. In a further effort to hack LabMD Files, Tiversa then instructed its computer in Pittsburgh to target and utilize the "push" feature of software on

LabMD's computer to capture and push eighteen (18) other files through LabMD's firewall in Atlanta, Georgia to its computer in Pittsburgh.

158.   Tiversa did not have authority or permission from either LabMD or anyone else to access, view, download or store the other 18 files.

159.   Tiversa then confirmed from a review of LabMD's 19 files that the owner of the files was LabMD and that LabMD was located in Atlanta, Georgia.

160.   Tiversa's theft of the 1718 File violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.   As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

a.   **Illegal Transfers of Stolen Property**

(i)   **Johnson and Dartmouth**

161.   Dartmouth and Johnson (the "Dartmouth Defendants") and Tiversa became research partners in or about 2005 in furtherance of the Dartmouth

Defendants' interest in learning more about P2P networks and P2P software. At that time, Defendants Johnson and Tiversa agreed to a non-disclosure agreement.

162.   In 2008, Tiversa was particularly interested in medical companies in part because of its partnership with the Dartmouth Defendants in a federally funded research study.

163.   As part of that study, the Dartmouth Defendants called upon Tiversa to search for, access, download and transfer to them Private and Confidential Files.

164.   Tiversa searched for files requested by the Dartmouth Defendants in January 2008.

165.   On January 30, Tiversa told the Dartmouth Defendants that the "initial read shows that we collected approximately 1,600 files across the 10 hospitals" and that it would run a "bot" to pull them.

166.   On April 29, 2008, while the Dartmouth Defendants were working on their upcoming research paper, they told Tiversa employee Chris Gormley in an email that the Dartmouth Defendants' initial search of files provided by Tiversa had "turned up some interesting stuff," but it was "not as rich" as the Dartmouth Defendants had hoped. The Dartmouth Defendants asked Tiversa to "share a

couple other of [its] recent medical finds … to *spice up the report* [and] … *really boost the impact of the report*." (emphasis added)).

167.  Without the permission of LabMD or any of the 9,300 patients identified in the 1718 File, Tiversa thereafter sent the 1718 File to the Dartmouth Defendants shortly after their April 29, 2008 request.

168.  As a result of that transfer, Tiversa and the Dartmouth Defendants violated 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information).

169.  Tiversa and the Dartmouth Defendants' conduct violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### (ii)    CIGNA

170.  On or about April 18, 2008, Tiversa reported to CIGNA, one of its customers, that Tiversa had located LabMD's 1718 File on a LabMD computer in Atlanta, Georgia (Tiversa's "First Forensic Report").  A true and correct copy of

Tiversa's First Forensic Report is attached hereto, marked as Exhibit D and incorporated herein by reference.

171. According to Tiversa in an August 12, 2008 Forensic Investigation Report to CIGNA (Tiversa's "Second Forensic Report"), a copy of the 1718 File was provided to CIGNA along with its First Forensic Report on April 18, 2008. A true and correct copy of Tiversa's Second Forensic Report is attached hereto, marked as Exhibit E and incorporated herein by reference. Tiversa sent the 1718 File to CIGNA in violation of 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information), 18 U.S.C. § 2314 (National Stolen Property Act) O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

### (iii)    The Privacy Institute

172. In August 2009, Tiversa, Kline, Morgan Lewis and Tarquinio provided the 1718 File to the FTC ostensibly through The Privacy Institute. They sent the 1718 File to The Privacy Institute and to the FTC in violation of 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information), 18 U.S.C. § 2314 (National Stolen Property Act) O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

173.   Tiversa, Kline, Morgan Lewis and Tarquinio's conduct violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).   As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 2.    Step 2 - Lie

174.   On May 13, 2008, Tiversa falsely and fraudulently reported to LabMD, in a telephone call placed by Boback, that Tiversa had detected and downloaded from a P2P network a confidential LabMD document.  Specifically, Tiversa and Boback falsely reported to John Boyle at LabMD that Tiversa (1) had "found" the 1718 File on P2P networks, (2) did not know the actual source of the 1718 File and (3) did not know when Tiversa had obtained the 1718 File.

175.   Immediately after Tiversa's initial call on May 13, 2008, LabMD investigated and determined that the 1718 File was inadvertently available on one of its computers because, unbeknownst to LabMD and in violation of company policy, P2P software was installed on a LabMD billing computer.   LabMD

immediately investigated, promptly discovered the vulnerability and removed the offending software right away. *That should have been the end of the issue.* Tiversa and Boback, however, would not leave well enough alone.

176.  Later in the day on May 13, 2008, Tiversa and Boback sent a forged email to John Boyle at LabMD.  The email purported to be from Tiversa employee Rick Wallace to "Mr. Boback" but, in fact, was not authored by Wallace.  The email falsely claimed the following:

- Tiversa's records showed that the 1718 File was continually available on peer-to-peer networks for sporadic periods over the past several months;

- Tiversa's computer system did not auto-record the IP;

- Even if the actual source IP address was in Tiversa's files, it was not readily available and it would take Tiversa "some time" to locate the information.

A true and correct copy of the May 13, 2008 email is attached hereto, marked as Exhibit F and incorporated herein by reference.

177.  On May 15, 2008, LabMD asked Tiversa to provide information from Tiversa's data store logs and the dates Tiversa claimed the 1718 File had "continued availability [on P2P networks] for sporadic periods over the past several months."

178.    Tiversa refused to disclose information about the whereabouts or its possession of the 1718 File without the payment of extortion money, cloaked as payment under a "services agreement."

179.  In an email dated May 22, 2008, from Boback to John Boyle at LabMD, Boback and Tiversa falsely represented to LabMD that LabMD needed remediation services because the 1718 File had "spread" and that LabMD needed to "act quickly to avoid further spread."  A true and correct copy of the May 22, 2008 email is attached hereto, marked as Exhibit G and incorporated herein by reference.

180.  In an email dated June 6, 2008, Boback and Tiversa falsely represented to LabMD that the 1718 File "will most likely have been already taken by secondary disclosure points which will need to be found and remediated."

181.   In an email dated July 15, 2008, Boback and Tiversa falsely represented to LabMD that, "We have continued to see individuals searching for and downloading copies of the file that was provided."  A true and correct copy of the July 15, 2008 email is attached hereto, marked as Exhibit I and incorporated herein by reference.

182.  At all times during Boback and Tiversa's communications with LabMD, Tiversa and Boback knew that in February 2008, Tiversa:

- hacked directly into a LabMD computer in Atlanta, Georgia;

- targeted and took control of software on that computer;

- targeted the 1718 File located in a folder on that computer;

- targeted and utilized the "push" feature of software on LabMD's computer to capture and push the 1718 File through LabMD's firewall in Atlanta, Georgia to Tiversa's computer in Pittsburgh, Pennsylvania;

- targeted and utilized the "browse host" feature of the software on LabMD's computer to learn that 18 other files could be taken from that computer;

- targeted, captured and then pushed those 18 files through LabMD's firewall to Tiversa's computer in Pittsburgh; and

- confirmed from a review of the 19 files that the owner of the files was LabMD and that LabMD was located in Atlanta, Georgia.

183.   Tiversa and Boback have always known that they never found the 1718 File anywhere other than on a LabMD computer in Atlanta, Georgia.  Yet by continuing to lie to LabMD, Tiversa and Boback intentionally caused LabMD to suffer unnecessary harm.

184.  Boback and Tiversa knew that each of their false statements were material misrepresentations of fact.

185.    Boback and Tiversa made each of the false statements with knowledge of their falsity.

186.    Boback and Tiversa intended for LabMD to rely upon their false statements for at least two reasons: (1) by incurring enough costs in LabMD's own investigation, LabMD would eventually be motivated to hire Tiversa after LabMD failed to uncover the source of the theft and (2) revenge, if LabMD refused to hire Tiversa.

187.    Tiversa and Boback's conduct violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).    As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 3.    Step 3 - Threaten

188.    Tiversa and Boback's solicitations of LabMD became more and more heavy handed over time – to the point of making threats and using their attorneys for assistance.  On July 23, 2008, for example, Boback sent the following email to LabMD's outside counsel with a copy to Kline and Morgan Lewis:

Mrs. Ellis,

Per our conversation yesterday, please confirm that you and/or your client (LabMD) are in compliance with state and federal breach notification laws regarding the disclosure of the estimated 9000 SSNs of the patients that have received services by LabMD. I know that during the call you questioned how I knew that you had not yet notified the affected individuals. Per your question, our counsel (copied above) has suggested that you provide written confirmation that you have done so.

Thank you in advance of your anticipated cooperation.

Sincerely,

Robert Boback
Chief Executive Officer

A true and correct copy of the July 23, 2008 email is attached hereto, marked as Exhibit J and incorporated herein by reference.

189. On November 21, 2008, counsel for LabMD received a telephone call from Jim Cook ("Cook") of the Cook Law Group in Pittsburgh, PA, another Tiversa attorney who was calling on behalf of Tiversa in yet another heavy-handed effort to coerce LabMD into hiring Tiversa.

190. Through Cook, Tiversa falsely represented that the 1718 File had been leaked from LabMD into the public domain. Cook implied that Tiversa was in discussions with the FTC about the 1718 File and stated, falsely, that Boback and Tiversa were concerned that if they did not disclose the "leak" to the FTC, they may be sued for having knowledge of the "breach" and not reporting it. In

making these false statements, Tiversa and Cook violated 18 U.S.C. § 1343 (Wire

Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).

### 4.    Step 4 - Retaliate

#### a.    The List

191.    When LabMD ultimately refused to do business with Tiversa, Tiversa

added LabMD to the List.    In fact, when Boback learned about Daugherty's

rejection, Boback said to one of Tiversa's analysts, "f--- him, make sure he's at

the top of the [L]ist."    *See* p. 1365 of Richard E. Wallace's May 5, 2015 trial

testimony in the FTC Enforcement Action.    A true and correct copy of Wallace's

May 5, 2015 testimony is attached hereto, marked as Exhibit K and incorporated

herein by reference.

192.  In or about August 2009, Tiversa, Kline, Morgan Lewis and

Tarquinio, via wire and mail, gave the List to the FTC along with Fraudulent

Statements Regarding Source, Disclosure, Spread and Bad Actors relating to

LabMD and other companies.

193.  As noted above, Tiversa, Kline, Morgan Lewis and Tarquinio's

conduct violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341

(Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of

Justice), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer

Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

194.   LabMD would not learn that Tiversa made Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors relating to LabMD at any time before former Tiversa employee and whistleblower Richard E. Wallace came forward on April 2, 2014.

### b.   Publicity Re: 1718 File

195.   As noted above, Tiversa gave LabMD's 1718 File to the Dartmouth Defendants soon after April 28, 2008.  Several weeks later, Tiversa began a series of solicitations to get LabMD to hire Tiversa to remedy the "breach" that Tiversa secretly caused.

196.   By July 2008, LabMD made it clear to Tiversa that it was not interested in hiring Tiversa.  It was at or about that time that Tiversa decided to retaliate against LabMD for its refusal.  That retaliation is evident in collaborative works created by Tiversa and the Dartmouth Defendants.

197.   In or about January 2009, the Dartmouth Defendants publicized an upcoming research paper authored by Johnson entitled "Data Hemorrhages in the Health-Care Sector" (the "Dartmouth Paper").

198.   The Dartmouth Paper was based on "[e]xperiments … conducted in collaboration with Tiversa … [and] supported by the U.S. Department of Homeland Security…."

199.   The Dartmouth Paper was presented at *Financial Cryptography and Data Security*, February 22-25, 2009, and posted on Dartmouth's website where it can be found today at http://digitalstrategies.tuck.dartmouth.edu/cds-uploads/research-projects/pdf/JohnsonHemorrhagesFC09Proceedingd.pdf.   A true and correct copy of the Dartmouth Paper is attached hereto, marked as Exhibit L and incorporated herein by reference.

200.   The Dartmouth Paper discusses the applicability of privacy rules of the Health Insurance Portability and Accountability Act (HIPAA), especially those regarding the use and disclosure of medical records.   The Dartmouth Defendants highlighted their "discovery" of the 1718 File as a "disturbing" example of how HIPAA does not provide adequate protection.   Those defendants

failed to disclose that Tiversa committed a felony[5] when it took the 1718 File from LabMD in blatant violation of HIPAA and the Dartmouth Defendants committed a felony by receiving and possessing the file.[6]

201. To avoid disclosing Tiversa's theft of the 1718 File (and the Dartmouth Defendants' illegal possession of that file), Tiversa and the Dartmouth Defendants decided that the Dartmouth Defendants would tell the Publicly Available Lie in their explanation of how they allegedly came to "find" the 1718 File:

- "Using information from the first sampling, we examined shared files on hosts where we had found other dangerous data. One of the features enabled by [P2P software] is the ability to examine all the shared files of a particular user (sometimes called "browse host"). Over the next six months, we periodically examined hosts that appeared promising for shared files."

- "Using this approach, we uncovered far more disturbing files. For a medical testing laboratory, we found a 1,718-page document containing patient Social Security numbers, insurance information, and treatment codes for thousands of patients. Figure 4 shows a redacted excerpt of just a single page of the insurance aging report containing patient name, Social Security number, date of birth, insurer, group number, and identification number. All together [sic], almost 9,000 patient identities were exposed in a single file, easily downloaded from a P2P network."

---

[5] 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information).

[6] *Id.*

202. Tiversa and the Dartmouth Defendants decided to make the following additional false, fraudulent and defamatory statements about the 1718 File and LabMD in the Dartmouth Paper:

- Data breaches and inadvertent disclosures of customer information have plagued sectors from banking to retail. [*false as to LabMD - Tiversa's hacking of the 1718 File was neither a breach nor an inadvertent disclosure*].

- In many of these cases, lost customer information translates directly into financial losses through fraud and identity theft. [*The only fraud and identity theft associated with the 1718 File was that committed by Tiversa. No consumer was ever harmed by any alleged disclosure of the 1718 file*].

- The healthcare sector also suffers such data hemorrhages, with multiple consequences. [*False as to LabMD*].

- In some cases, the losses have translated to privacy violations and embarrassment. [*False as to LabMD*].

- In other cases, criminals exploit the information to commit fraud or medical identity theft. [*Other than Tiversa's illegal theft of the 1718 File, this was false as to LabMD*].

- These files [including the 1718 File] were inadvertently published [*false as to LabMD*] in popular peer-to-peer file sharing networks like Limewire and Bearshare [*false as to LabMD*] and could be easily downloaded [*false as to LabMD*] by anyone searching for them [*false as to LabMD*].

- The extended enterprises of health-care providers often include many technically unsophisticated partners who are more likely to leak information [*false as to LabMD*].

- While some hemorrhages are related to business information, like marketing plans or financial documents, we focus on the more disturbing releases of individually identifiable information and protected health information [*false - the 1718 file was never released or "hemorrhaged"*]."

- In these cases, the consequences range from privacy violations (including violations of both state privacy laws and federal HIPPA standards) to more serious fraud and theft [*false as to LabMD*].

- For a medical testing laboratory, we found a 1,718-page document containing patient Social Security numbers, insurance information, and treatment codes for thousands of patients [*false – the 1718 File was hacked from LabMD by Tiversa*]."

- All together [sic], almost 9,000 patient identities were exposed in a single file, easily downloaded from a P2P network [*false – the 1718 File was hacked and under any scenario it was not "easily downloaded"*].

203.   The Dartmouth Paper resulted in a great deal of media attention from publications dealing with privacy like *SC Magazine*, technology publications like *Wired* and general interest publications like *USA Today*.

204.   *Wired* magazine published the Dartmouth Paper, in print and online, in 2009.   Print versions of the Dartmouth Paper were mailed to many *Wired* subscribers.

205.   The Dartmouth Defendants' use of the 1718 File in preparing and publishing the Dartmouth Paper violated 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information).

206.   The Dartmouth Defendants knew or should have known that Tiversa had obtained the 1718 File in violation of several laws, including 42 U.S. Code § 1320d–6, 18 U.S.C. § 1028 (Identity Fraud), 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity)

207.   Tiversa and the Dartmouth Defendants conduct violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).   As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### c.   **Preludes to FTC Investigation**

208.   By January 2009, Tiversa was building the List it would give to the FTC several months later.   Tiversa and the FTC were having detailed discussions about Tiversa's findings and the FTC's intent to investigate and prosecute

companies for allegedly leaking Private and Confidential Files on the internet through P2P software.

209.   In this timeframe, Boback told FTC investigator Carl Settlemyer about the upcoming publication of the Dartmouth Paper.   This motivated Settlemyer to send the following email to the Dartmouth Defendants on February 3, 2009:

> Professor Johnson:
>
> We hope you are well. We saw that you have a new article coming out concerning health info available on P2P networks and were wondering if you could send us a copy when it becomes available.  As you know from our past discussions, this is an area of interest to us.  It sounds like this article is a significant expansion of your prior work.  We look forward to reading it.
>
> Thanks.
>
> Carl S.

A true and correct copy of the February 3, 2009 email is attached hereto, marked as Exhibit M and incorporated herein by reference.

210.   On May 5, 2009, Boback testified before the U.S. House of Representatives Subcommittee on Commerce, Trade and Consumer Protection of the Committee on Energy and Commerce on proposed legislation - H.R. 2221, The Data Accountability and Protection Act, and H.R. 1319, The Informed P2P User Act.  A senior official from the Federal Trade Commission also testified at that

hearing.  In his prepared statement to the Committee dated May 4, 2009, Boback

highlighted the 1718 File as an example of a medical file that was "leaked" onto

P2P networks.   Boback included the 1718 File in a further effort to instigate the

FTC into investigating and prosecuting LabMD.   True and correct copies of

Boback's May 5, 2009 oral testimony and written presentation are attached hereto,

marked as Exhibit M and incorporated herein by reference.

    d. **FTC Investigation**

  211. Tiversa's utilization of the FTC as a tool for retaliation was

successful.

  212. By letter dated January 19, 2010, Alain Sheer of the Federal Trade

Commission informed LabMD that the FTC had begun a non-public inquiry into

LabMD's cybersecurity practices.  A true and correct copy of the January 19, 2010

correspondence is attached hereto, marked as Exhibit O and incorporated herein by

reference.

  213. The FTC did not disclose its relationship with Tiversa or the fact that

Tiversa instigated the investigation.   With the benefit of hindsight, the FTC's

reliance on and utilization of Tiversa's Publicly Available Lie and Fraudulent

Statements Regarding Disclosure, Source, Spread and Bad Actors about LabMD is

evident in the following sentence in Sheer's January 19, 2010 letter to LabMD:

> According to information we have received, a computer file (or files) from your computer network *is* available to users on a peer-to-peer file sharing ("P2P") network (hereinafter, "P2P breach").

(Emphasis added.)

214. The timing and fact of the FTC's non-public inquiry was odd to LabMD for several reasons including the fact that (1) the episode involving Tiversa and the 1718 File had *concluded* over a year earlier and (2) LabMD had *completely resolved* the issue when it removed the offending P2P software from its billing computer within moments of Tiversa's first contact on May 13, 2008.

215. Regardless of the FTC's motivation, LabMD did not have the evidence, the technological resources or the financial means to disprove the FTC's allegations. No one did, and Tiversa knew this. No one, regardless of their technological or financial means, could scour *every* file available on *every* computer on *every* P2P network to *prove* that the 1718 File was *never* publicly available, had *not* been disclosed, had *not* spread to other computers on P2P networks and was *never* taken by identity thieves, bad actors or anyone *other* than Tiversa.

216. The FTC's investigation of LabMD lasted over three and a half years and all but destroyed LabMD.

217.  Tiversa cooperated with and supported the FTC with false claims and manufactured evidence during the FTC's entire investigation of LabMD.

218.  The FTC would not have investigated or prosecuted LabMD but for Tiversa's theft of the 1718 File, Tiversa's Publicly Available Lie and Tiversa's Fraudulent Statements Regarding Disclosure, Source, Spread and Bad Actors about LabMD.

219.  Tiversa's conduct violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### e.    FTC Enforcement Action

220.  Tiversa's aggressive sales tactics in combination with the FTC's unrelenting investigation of LabMD caused Daugherty to write a book about his and LabMD's ordeal – *The Devil Inside the Beltway*.

221.   The first public announcement for *The Devil Inside The Beltway* was a video trailer Daugherty posted on a website on July 19, 2013.   At that point, the FTC investigation was into its fourth year.   Just *three days* after the announcement for *The Devil Inside the Beltway*, FTC investigator Alain Sheer (whom the book portrayed in a very negative light) told a LabMD attorney that Sheer and his staff had just recommended an enforcement action against LabMD.

222.   On August 28, 2013, the FTC filed the Enforcement Action and has vigorously prosecuted LabMD to this day.

223.   Tiversa has cooperated with and supported the FTC during every stage of its prosecution of LabMD.   As indicated elsewhere in this Complaint, Tiversa gave the FTC perjured testimony and fabricated evidence in pursuit of its revenge against LabMD and Daugherty.

f.   **Federal Defamation Action**

224.   Tiversa coordinated with the FTC a retaliatory strike against LabMD and Daugherty.   On September 5, 2013 (just one week after the Enforcement Action was filed), Tiversa and Boback sued LabMD and Daugherty in *Tiversa Holding Corp. and Robert J. Boback v. LabMD, Inc., and Michael J. Daugherty*, in the United States District Court for the Western District of Pennsylvania, Civil

Action No. 2:13-cv-01296-NBF (the "Federal Defamation Action"), alleging that Daugherty and LabMD defamed them in *The Devil Inside the Beltway*.

225.  The claims in the Federal Defamation Action were entirely frivolous, so much so that to avoid any discovery of their wrongdoing, Tiversa and Boback dismissed the Federal Defamation Action on November 4, 2014, on the eve of discovery.

g.  **State Defamation Action**

226.  On September 5, 2013, Tiversa and Boback retaliated again by filing essentially the same frivolous defamation claims against LabMD and Daugherty in *Tiversa Holding Corp. and Robert J. Boback v. LabMD, Inc., Michael J. Daugherty, Cause of Action Institute and Richard E. Wallace*, in the Court of Common Pleas of Allegheny County, Pennsylvania, Civil Division, GD-14-016497 (the "State Defamation Action.").

227.  Tiversa recently dismissed its frivolous claims in the State Defamation Action, again on the eve of discovery.

228.  Tiversa's pursuit of frivolous claims in the State Defamation Action coupled with its refusal to participate in discovery is yet another instance of Tiversa using litigation for the illegitimate purpose of retaliating against Daugherty and LabMD.

**D.    Tiversa Targets Other Georgia Companies**

    **1.    Coca-Cola**

        a.    **Step 1 - Steal**

229.   On May 6, 2008, Tiversa hacked into and stole files from a computer owned by Coca-Cola in Atlanta.   Tiversa instructed one of its computers in Pittsburgh to target and utilize the "push" feature of software on Coca-Cola's computer in Atlanta to capture and push the Coca-Cola files through Coca-Cola's firewall in Atlanta to Tiversa's computer in Pittsburgh.

230.   After Coca-Cola's files were "pushed" from Coca-Cola's computer to Tiversa's computer in Pittsburgh, a Tiversa employee then viewed and stored the Coca-Cola files.

231.   Tiversa did not have authority or permission from Coca-Cola to access, view, download or store the Coca-Cola files.

232.   After Tiversa downloaded and viewed the Coca-Cola files, a Tiversa employee instructed a Tiversa computer in Pittsburgh to target and utilize the "browse host" feature of software on the Coca-Cola computer in Atlanta to learn what other files could be accessed and downloaded from the Coca-Cola computer.

233.   The Tiversa employee then instructed the Tiversa computer in Pittsburgh to target and utilize the "push" feature of software on the Coca-Cola

computer to capture and push other Coca-Cola files through Coca-Cola's firewall in Atlanta to a Tiversa computer in Pittsburgh.

234.   Tiversa did not have authority or permission from Coca-Cola or anyone else to access, view, download or store any of Coca-Cola's files.

235.   Tiversa's theft of Coca-Cola's files violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

      b.   **Step 2 - Lie**

236.   Tiversa then contacted Coca-Cola in Atlanta to solicit Coca-Cola's business in the same fashion that Tiversa solicited business from LabMD (*i.e.*, using the Publicly Available Lie and Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors).

237.   Tiversa's lies regarding Coca-Cola's files violated 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

     c.    **Step 3 - Threaten**

238.   LabMD and Daugherty believe Tiversa used Defendants Kline and Morgan Lewis for heavy-handed solicitations similar to how Tiversa used attorneys in its July 23, 2008 and November 21, 2008 communications to LabMD.

     d.    **Step 4 - Retaliate**

239.   After Coca-Cola refused Tiversa's solicitations, Boback directed a Tiversa employee to put Coca-Cola's name on a list of companies that Tiversa would later give to the FTC (the "List," identified above) along with the false claim that Coca-Cola had made Private and/or Confidential Files publicly available on a P2P network.   Tiversa alleged to the Federal Trade Commission that Coca-Cola disclosed confidential billing information on 282 businesses and/or individuals.

240.   Tiversa's retaliation violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and  O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

2.    **Papa John's**

    a.    **Step 1 - Steal**

241.   On July 3, 2008, Tiversa hacked into and stole files from a computer owned by Papa John's Pizza Restaurants ("Papa John's") in Atlanta.  Tiversa instructed one of its computers in Pittsburgh to target and utilize the "push" feature of software on Papa John's computer in Atlanta to capture and push the Papa John's files through Papa John's firewall in Atlanta to Tiversa's computer in Pittsburgh.

242.   After Papa John's files were "pushed" from Papa John's computer to Tiversa's computer in Pittsburgh, a Tiversa employee then viewed and stored the Papa John's files.

243.   Tiversa did not have authority or permission from Papa John's to access, view, download or store the Papa John's files.

244.    After Tiversa downloaded and viewed the Papa John's files, a Tiversa employee instructed a Tiversa computer in Pittsburgh to target and utilize the "browse host" feature of software on the Papa John's computer in Atlanta to learn what other files could be accessed and downloaded from the Papa John's computer.

245.   The Tiversa employee then instructed the Tiversa computer in Pittsburgh to target and utilize the "push" feature of software on the Papa John's computer to capture and push other Papa John's files through Papa John's firewall in Atlanta to a Tiversa computer in Pittsburgh.

246.   Tiversa did not have authority or permission from Papa John's or anyone else to access, view, download or store any of Papa John's files.

247.   Tiversa's theft of Papa John's files violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

### b.   Step 2 - Lie

248.   Tiversa then contacted Papa John's in Atlanta to solicit Papa John's business in the same fashion that Tiversa solicited business from LabMD (*i.e.*, using the Publicly Available Lie and Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors).

249.   Tiversa's lies regarding Papa John's files violated 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

c.    **Step 3 - Threaten**

250.   LabMD and Daugherty believe Tiversa used Defendants Kline and Morgan Lewis for heavy-handed solicitations similar to how Tiversa used attorneys in its July 23, 2008 and November 21, 2008 communications to LabMD.

d.    **Step 4 - Retaliate**

251.   After Papa John's refused Tiversa's solicitations, Boback directed a Tiversa employee to put Papa John's name on a list of companies that Tiversa would later give to the FTC (the "List," identified above) along with the false claim that Papa John's had made Private and/or Confidential Files publicly available on a P2P network. Tiversa alleged to the Federal Trade Commission that Papa John's disclosed PII on 194 individuals.

252.   Tiversa's retaliation violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and  O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

### 3.    Logisticare

#### a.    Step 1 - Steal

253.  On October 1, 2008, Tiversa hacked into and stole files from a computer owned by Logisticare Solutions, LLC ("Logisticare") in Atlanta. Tiversa instructed one of its computers in Pittsburgh to target and utilize the "push" feature of software on Logisticare's computer in Atlanta to capture and push the Logisticare files through Logisticare's firewall in Atlanta to Tiversa's computer in Pittsburgh.

254.  After Logisticare's files were "pushed" from Logisticare's computer to Tiversa's computer in Pittsburgh, a Tiversa employee then viewed and stored the Logisticare files.

255.  Tiversa did not have authority or permission from Logisticare to access, view, download or store the Logisticare files.

256.  After Tiversa downloaded and viewed the Logisticare files, a Tiversa employee instructed a Tiversa computer in Pittsburgh to target and utilize the "browse host" feature of software on the Logisticare computer in Atlanta to learn what other files could be accessed and downloaded from the Logisticare computer.

257.  The Tiversa employee then instructed the Tiversa computer in Pittsburgh to target and utilize the "push" feature of software on the Logisticare computer to capture and push other Logisticare files through Logisticare's firewall in Atlanta to a Tiversa computer in Pittsburgh.

258.  Tiversa did not have authority or permission from Logisticare or anyone else to access, view, download or store any of Logisticare's files.

259.  Tiversa's theft of Logisticare's files violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

b.  **Step 2 - Lie**

260.  Tiversa then contacted Logisticare in Atlanta to solicit Logisticare's business in the same fashion that Tiversa solicited business from LabMD (*i.e.*, using the Publicly Available Lie and Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors).

261.  Tiversa's lies regarding Logisticare's files violated 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

c.    **Step 3 - Threaten**

262.   LabMD and Daugherty believe Tiversa used Defendants Kline and Morgan Lewis for heavy-handed solicitations similar to how Tiversa used attorneys in its July 23, 2008 and November 21, 2008 communications to LabMD.

d.    **Step 4 - Retaliate**

263.   After Logisticare refused Tiversa's solicitations, Boback directed a Tiversa employee to put Logisticare's name on a list of companies that Tiversa would later give to the FTC (the "List," identified above) along with the false claim that Logisticare had made Private and/or Confidential Files publicly available on a P2P network.   Tiversa alleged to the Federal Trade Commission that Logisticare disclosed PII and/or PHI on 26 individuals.

264.   Tiversa's retaliation violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and   O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

4.    **Franklin's Budget Auto Sales**

a.    **Step 1 - Steal**

265.   On November 16, 2008, Tiversa hacked into an employee's home computer and stole files owned by Franklin's Budget Auto Sales, Inc. ("Franklin's") in Statesboro, Georgia.  Tiversa instructed one of its computers in Pittsburgh to target and utilize the "push" feature of software on that computer (located in or near Statesboro) to capture and push the Franklin's files through the firewall in the employee's computer to Tiversa's computer in Pittsburgh.

266.   After Franklin's files were "pushed" to Tiversa's computer in Pittsburgh, a Tiversa employee then viewed and stored the Franklin's files.

267.   Tiversa did not have authority or permission from Franklin's to access, view, download or store the Franklin's files.

268.    After Tiversa downloaded and viewed the Franklin's files, a Tiversa employee instructed a Tiversa computer in Pittsburgh to target and utilize the "browse host" feature of software on the employee's computer in Statesboro to learn what other files could be accessed and downloaded from that computer.

269.   The Tiversa employee then instructed the Tiversa computer in Pittsburgh to target and utilize the "push" feature of software on the employee's

computer to capture and push other Franklin's files through the firewall in the employee's computer to Tiversa's computer in Pittsburgh.

270.   Tiversa did not have authority or permission from Franklin's or anyone else to access, view, download or store any of the additional Franklin's files.

271.   Tiversa's theft of Franklin's files violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

b.    **Step 2 - Lie**

272.   Tiversa then contacted Franklin's in Statesboro to solicit Franklin's business in the same fashion that Tiversa solicited business from LabMD (*i.e.*, using the Publicly Available Lie and Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors).

273.   Tiversa's lies regarding Franklin's files violated 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

c.    **Step 3 - Threaten**

274.    LabMD and Daugherty believe Tiversa used Defendants Kline and Morgan Lewis for heavy-handed solicitations similar to how Tiversa used attorneys in its July 23, 2008 and November 21, 2008 communications to LabMD. This time, however, Tiversa asked Franklin's for payment of $18 per found party (those whose PII was allegedly found in the Franklin's files). When Franklin' refused, Tiversa told Franklin's their cost of repairing the "leak" would go up because Tiversa would search for more of Franklin's files. In the final count, Tiversa alleged to the Federal Trade Commission that Franklin's disclosed PII on 22,448 individuals ($18 x 22,448 = $404,064).

d.    **Step 4 - Retaliate**

275.    After Franklin's refused Tiversa's solicitations, Boback directed a Tiversa employee to put Franklin's name on a list of companies that Tiversa would later give to the FTC (the "List," identified above) along with the false claim that Franklin's had made Private and/or Confidential Files publicly available on a P2P network.

276.    Tiversa's retaliation violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-14-3(5)(b) (Racketeering

Activity) and  O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

### 5.    Georgia Music Educators Association

#### a.    Step 1 - Steal

277.   On November 24, 2008, Tiversa hacked into and stole files from a computer owned by Georgia Music Educators Association ("GMEA") in Stockbridge, GA.  Tiversa instructed one of its computers in Pittsburgh to target and utilize the "push" feature of software on GMEA's computer in Stockbridge to capture and push the GMEA files through GMEA's firewall in Stockbridge to Tiversa's computer in Pittsburgh.

278.   After GMEA's files were "pushed" from GMEA's computer to Tiversa's computer in Pittsburgh, a Tiversa employee then viewed and stored the GMEA files.

279.   Tiversa did not have authority or permission from GMEA to access, view, download or store the GMEA files.

280.   After Tiversa downloaded and viewed the GMEA files, a Tiversa employee instructed a Tiversa computer in Pittsburgh to target and utilize the "browse host" feature of software on the GMEA computer in Stockbridge to learn what other files could be accessed and downloaded from the GMEA computer.

281.  The Tiversa employee then instructed the Tiversa computer in Pittsburgh to target and utilize the "push" feature of software on the GMEA computer to capture and push other GMEA files through GMEA's firewall in Stockbridge to a Tiversa computer in Pittsburgh.

282.  Tiversa did not have authority or permission from GMEA or anyone else to access, view, download or store any of GMEA's files.

283.  Tiversa's theft of GMEA's files violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

b.  **Step 2 - Lie**

284.  Tiversa then contacted GMEA in Stockbridge to solicit GMEA's business in the same fashion that Tiversa solicited business from LabMD (*i.e.*, using the Publicly Available Lie and Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors).

285.  Tiversa's lies regarding GMEA's files violated 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

    c.    **Step 3 - Threaten**

286.   LabMD and Daugherty believe Tiversa used Defendants Kline and Morgan Lewis for heavy-handed solicitations similar to how Tiversa used attorneys in its July 23, 2008 and November 21, 2008 communications to LabMD.

    d.    **Step 4 - Retaliate**

287.   After GMEA refused Tiversa's solicitations, Boback directed a Tiversa employee to put GMEA's name on a list of companies that Tiversa would later give to the FTC (the "List," identified above) along with the false claim that GMEA had made Private and/or Confidential Files publicly available on a P2P network.  Tiversa alleged to the Federal Trade Commission that GMEA disclosed PII on 58 individuals.

288.   Tiversa's retaliation violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and  O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

**E.    Tiversa Targets AIDS Clinic**

**1.    Step 1 - Steal**

289.    In May or June of 2008, Tiversa stole files owned by the Open Door Clinic ("Open Door"), a small non-profit healthcare organization located in Elgin, Illinois.    Open Door provides education, testing, and treatment for sexually transmitted infections, including HIV/AIDS.

290.    Tiversa did not have authority or permission from Open Door or its patients to access, view, download or store the Open Door files.

291.    Tiversa's theft of Open Door's files violated 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

**2.    Step 2 - Lie**

292.    Tiversa then contacted Open Door, beginning on or about July 14, 2008, to solicit Open Door's business in the same fashion that Tiversa solicited business from LabMD (*i.e.*, using the Publicly Available Lie and Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors).

293.   Tiversa's lies regarding Open Door's files violated 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

### 3.    Step 3 - Threaten

294.   LabMD and Daugherty believe Tiversa used Defendants Kline and Morgan Lewis for heavy-handed solicitations similar to how Tiversa used attorneys in its July 23, 2008 and November 21, 2008 communications to LabMD.

### 4.    Step 4 - Retaliate

295.   After Open Door refused Tiversa's solicitations, Boback directed a Tiversa employee to put Open Door's name on a list of companies that Tiversa would later give to the FTC (the "List," identified above) along with the false claim that Open Door had made Private and/or Confidential Files publicly available on a P2P network.   Tiversa alleged to the Federal Trade Commission that Open Door disclosed PII and/or PHI on 184 individuals.

296.   Tiversa also called the patients listed on the document it downloaded from Open Door. Tiversa employees thought that by calling the patients and ginning up the leak, they could scare the clinic into hiring Tiversa.

297.  Tiversa also provided information on the Open Door "leak" to Michael Bruzzese, one of Tiversa's attorneys.  At all times relevant to these allegations, Bruzzese was acting as an agent for Tiversa.

298.  Tiversa gave Bruzzese one of the documents Tiversa took from Open Door and told Bruzzese, falsely, that Tiversa had also determined that an "information aggregator" located in Apache Junction, Arizona downloaded Open Door's documents.

299.  Bruzzese "retained the services of an attorney who devotes his practice to matters involving legal ethics and the rules of professional responsibility to provide us legal advice as to how and in what manner we could solicit potential clients for this case."  Bruzzese determined that "it was permitted to contact the potential class members by mail" and sent letters to all patients on the list Tiversa provided him.  The letter was a "solicitation to provide legal services," and asked the recipient to sign on as a class representative for the suit.

300.  Between October 29, 2008 and November 5, 2009, Tiversa independently contacted more than 50 patients of the Open Door Clinic about the "leak."  During each of those calls, Tiversa made Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors regarding Open Door's

alleged leak. These calls were made just before Open Door patients received Bruzzese's solicitations for them to join a class action suit against Open Door.

301. Several of the Open Door patients filed a lawsuit against Open Door in February 2010. See *John Doe 1, et al. v. Open Door Clinic of Greater Elgin*, in the Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois, Civil Action No. 2010L 107 (the "Open Door Litigation"). The plaintiffs were represented by Terry Heady, an attorney Bruzzese engaged as another of Tiversa's agents. Bruzzese supported Heady in the preparation and prosecution of the Open Door Litigation.

302. Tiversa supported the Open Door Litigation in a number of ways, including the production of a 42-page forensic investigation draft report and a 39-page final forensic investigation report for Bruzzese and Heady's use in the litigation. All of Tiversa's services to Bruzzese and Heady were performed at no charge.

303. In discovery, Open Door learned from Tiversa's documents that the only source of the "leak" was a computer that had been stolen from Open Door.

304. Tiversa knew all along that Open Door Clinic had not disclosed, leaked, revealed, compromised or misused the documents at issue in the Open Door Litigation.

305.    Tiversa, Heady and Bruzzese made Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors in the Complaint in the Open Door Litigation, including the following:

- The plaintiffs…have had personal, medical, financial and/or other sensitive information (collectively referred to as 'personally identifiable information' or 'PII') that they provided and/or entrusted to and stored by the Clinic disclosed, leaked, revealed, compromised and/or misused.

- The Clinic negligently, wrongfully and improperly leaked, disseminated and disclosed its patients personally identifiable information, including, but not limited to their HIV/AIDS status over peer to peer ("P2P") file sharing networks where the information was made readily available, accessible and retrievable to the public at large, including criminal actors who used the Clinic's patients' personally identifiable information to engage in identity theft and fraud.

- John Doe 1's personally identifiable information, including his HIV/AIDS status was leaked, disseminated and disclosed by the Clinic over the P2P networks to the public at large.  [These allegations were repeated for each plaintiff.]

- Criminal actors found and downloaded this information and used John Doe 1's personally identifiable information to commit identity theft and fraud.  [These allegations were repeated for each plaintiff.]

- At some point, a P2P file sharing software client was installed on one or more of the Clinic's computers and/or the personal laptop or home computer of employees who were storing patients' personally identifiable information.

- Specifically, the Clinic and/or its employees stored a spreadsheet, with the filename "Master List," containing personally identifiable information pertaining to approximately 260 of its patients on a computer

that had P2P file sharing client installed.  This spreadsheet was made available to the public.

- The spreadsheet was searched, accessed, downloaded and re-shared by various P2P file sharing users throughout the world from May 26, 2008 through the present.

- One user who has downloaded the spreadsheet is believed to be located in Apache Junction, AZ.  Upon information and belief, the Apache Junction, AZ user is an identity thief who collects and distributes data containing personally identifiable information to other criminal actors.

- The Apache Junction user continues to re-share the spreadsheet on the P2P networks.

A true and correct copy of the complaint in the Open Door Litigation is attached hereto, marked as Exhibit P and incorporated herein by reference.

306.  Tiversa's retaliation violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and  O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

**F.    LabMD's Due Diligence**

**1.    Twenty Four Attorneys**

307.  From May 13 2008, until April 2, 2014, LabMD and Daugherty sought legal counsel regarding the FTC's allegations and Tiversa's conduct from at least twenty-four (24) attorneys.

308.  For example, beginning on May 13, 2008, shortly after Boback first contacted LabMD, LabMD sought legal consultation from its outside counsel Phillipa V. Ellis at the law firm of Owen, Gleaton, Egan, Jones & Sweeney in Atlanta.

309.  Beginning on January 19, 2010, LabMD sought legal consultation from Ms. Ellis relating to the non-public inquiry initiated by the FTC.

310.  On April 2, 2014, Daugherty received a telephone call from Rick Wallace, the former Tiversa employee and whistleblower discussed above.

311.   At no time before April 2, 2014, did Ms. Ellis ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO.  At no time before April 2, 2014, did Ms. Ellis ever suggest that the FTC was relying upon Tiversa's *lies*.

312.    In August 2010, LabMD engaged Benjamin Wright from Dallas, Texas, for legal advice relating to Tiversa and the Federal Trade Commission.  At no time before April 2, 2014, did Mr. Wright ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO.  At no time before April 2, 2014, did Mr. Wright ever suggest that the FTC was relying upon Tiversa's *lies*.

313.    In March 2011, LabMD engaged Stephen F. Fusco of Atlanta for legal advice relating to Tiversa and the Federal Trade Commission.  At no time before April 2, 2014, did Mr. Fusco ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO.  At no time before April 2, 2014, did Mr. Fusco ever suggest that the FTC was relying upon Tiversa's *lies*.

314.    In March 2011, LabMD engaged Dana Rosenfeld and Kristin McPartland at the law firm of Kelley Drye in Washington, D.C., for legal advice relating to Tiversa and the Federal Trade Commission.  At no time before April 2, 2014, did Dana Rosenfeld or Kristin McPartland ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation,

defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO. At no time before April 2, 2014, did Dana Rosenfeld or Kristin McPartland ever suggest that the FTC was relying upon Tiversa's *lies*.

315.    In September 2011, LabMD engaged Claudia Calloway and Christina Grigorian at the law firm of Katten Muchin in Washington, D.C., for legal advice relating to Tiversa and the Federal Trade Commission. At no time before April 2, 2014, did Claudia Calloway or Christina Grigorian ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO. At no time before April 2, 2014, did Claudia Calloway or Christina Grigorian ever suggest that the FTC was relying upon Tiversa's *lies*.

316.    In September 2012, LabMD engaged Thomas J. Archer and Christopher S. Anulewicz at the law firm of Balch & Bingham in Atlanta for legal advice relating to the Federal Trade Commission. At no time before April 2, 2014, did Thomas J. Archer or Christopher S. Anulewicz ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO. At no time before April 2, 2014, did Thomas J. Archer or

Christopher S. Anulewicz ever suggest that the FTC was relying upon Tiversa's *lies*.

317.    In August 2013, LabMD engaged Cause of Action in Washington, D.C., for legal advice relating to the Federal Trade Commission.  Attorneys at Cause of Action who represented LabMD included Daniel Z. Epstein, Patrick Massari, Kent Huntington, Michael D. Pepson, Hallee Morgan and Robyn Burrows.  At no time before April 2, 2014, did the attorneys at Cause of Action ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO. At no time before April 2, 2014, did the attorneys at Cause of Action ever suggest that the FTC was relying upon Tiversa's *lies*.

318.    Shortly after LabMD engaged Cause of Action in August 2013, Cause of Action engaged the law firm of Dinsmore & Shohl in Washington, D.C. for legal advice relating to the Federal Trade Commission.  Attorneys at Dinsmore & Stohl who represented LabMD included Reed D. Rubinstein, William Sherman II and Sunni Harris.  At no time before April 2, 2014, did Reed D. Rubinstein, William Sherman II or Sunni Harris ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation,

tortious interference with actual or prospective contracts, federal RICO or state RICO. At no time before April 2, 2014, did Reed D. Rubinstein, William Sherman II or Sunni Harris ever suggest that the FTC was relying upon Tiversa's *lies*.

319.    Shortly after September 13, 2013, when LabMD and Daugherty were served with the summons and complaint in the Federal Defamation Action, LabMD and Daugherty engaged Richard T. Victoria and Alexander W. Saksen at the law firm of Gordon Rees in Pittsburgh, Pennsylvania and Cynthia L. Counts at Counts Law Group in Atlanta to defend LabMD and Daugherty in that suit. At no time before April 2, 2014, did Richard T. Victoria, Alexander W. Saksen or Cynthia L. Counts ever suggest to LabMD that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO. At no time before April 2, 2014, did Richard T. Victoria, Alexander W. Saksen or Cynthia L. Counts ever suggest that the FTC was relying upon Tiversa's *lies*.

### 2.    FTC's Silence

320.    Other than stating their alleged belief that LabMD had made the 1718 File publicly available on P2P networks, the FTC investigators refused to tell LabMD the basis for their non-public inquiry and subsequent investigation. At no time during their investigation did the FTC disclose to LabMD any of the

information or documentation they had received from Tiversa, the Dartmouth

Defendants, Settlemyer or anyone else.[7]

### 3. LabMD's 2010 Inquiries

321. By letter dated September 30, 2010, LabMD sent a list of questions to

Tiversa and the Dartmouth Defendants. Ms. Ellis and Mr. Wright were the

primary authors of those letters. True and correct copies of LabMD's September

30, 2010 inquiries are attached hereto, marked as Exhibit Q and incorporated

herein by reference.

322. LabMD did not accuse Tiversa or the Dartmouth Defendants of fraud,

negligent misrepresentation, defamation, tortious interference with actual or

prospective contracts, federal RICO or Georgia RICO in LabMD's September 30,

2010 letter because LabMD was not aware of any facts that would support such

claims. LabMD did not know and had no reason to know that Tiversa had *lied* to

the FTC.

---

[7] On November 20, 2015, Michael J. Daugherty and LabMD filed a Bivens action against the FTC Investigators in Washington, D.C. See *Michael J. Daugherty and LabMD, Inc. v. Alain H. Sheer, Ruth T. Yodaiken and Carl H. Settlemyer, III*, in the United States District Court for the District of Columbia, Civil Action No. 1:15-cv-02034. As alleged therein, the FTC Investigators were or became complicit in Tiversa's fraud. The timing, extent and circumstances of their complicity is expected to develop in discovery.

323.  Tiversa and the Dartmouth Defendants all failed to respond to the September 30, 2010 letters.

### 4.  Georgia Action

324.  On October 19, 2011, LabMD filed *LabMD, Inc. v. Tiversa, Inc., Trustees of Dartmouth College and M. Eric Johnson*, in the Superior Court of Fulton County, Georgia, Civil Action No. 2011CV207137.  That action was removed to federal court on November 23, 2011, where it was styled as *LabMD, Inc. v. Tiversa, Inc., Trustees of Dartmouth College and M. Eric Johnson*, in the United States District Court for the Northern District of Georgia, Civil Action No. 1:11-cv-4044.  An appeal in that action was docketed with the appellate court on August 31, 2012, where it was styled *LabMD, Inc. v. Tiversa, Inc., Trustees of Dartmouth College and M. Eric Johnson*, in the United States Court of Appeals for the Eleventh Circuit, Appeal No. 12-14504.  All three of these actions will hereinafter be referred to as the "Georgia Action."

325.  In the Georgia Action, LabMD included counts for violations of the Computer and Fraud Abuse Act (18 U.S.C.  1030), computer crimes under O.C.G.A. § 16-9-3, conversion, trespass and punitive damages.

326.  LabMD did *not* include counts for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal

RICO or Georgia RICO in the Georgia Action because LabMD was not aware of any facts that would support such claims.

327.  As of October 19, 2011 (and continuing until October 6, 2013), LabMD did not know and had no reason to know that Tiversa had *lied* to the FTC.

328.  Because Tiversa filed and eventually succeeded on a motion to dismiss the Georgia Action for lack of personal jurisdiction, LabMD was never able to take any discovery from Tiversa.

### 5.    FTC Enforcement Action

329.  Between November 21, 2013 and April 20, 2014, forty-one (41) depositions were taken in the FTC Enforcement Action.  Daugherty attended almost all of those depositions.

330.  On January 30, 2014, LabMD served a *subpoena ad testificandum* on Tiversa employee Richard E. Wallace ("Wallace") for a deposition to be taken in Pittsburgh, Pennsylvania, in February 2014.

331.  On February 26, 2014, Tiversa's attorney informed LabMD that Wallace was "no longer available" to be deposed due to an "unexpected medical issue."

332.  On April 2 and April 3, 2014, Daugherty received telephone calls from Wallace who reported the following to Daugherty:

- Wallace's employment at Tiversa was terminated on April 1, 2014, after Wallace refused to comply with Boback's demand that Wallace lie under oath to the federal government.

- Boback lied about where the 1718 File was found.

- The 1718 File was never found anywhere other than on a LabMD computer in Atlanta, Georgia.

- Tiversa took the 1718 File from LabMD's computer.

- A story regarding Tiversa's discovery of Marine One documents on a computer in Iran was false. Boback had directed Wallace to fabricate evidence to support the story.

333. On November 14, 2014, the U.S. Attorney General issued Wallace a grant of immunity pursuant to 18 U.S.C. § 6002.

334. Pursuant to that grant of immunity, Wallace testified in the Enforcement Action on May 5, 2015, where he disclosed the following:

- On February 25, 2008, Tiversa located the 1718 File on a LabMD computer near Atlanta, Georgia.

- After Tiversa downloaded and reviewed the 1718 File, it used a "browse host" function to cause LabMD's computer to show it other files that were in the same folder as the 1718 File. Tiversa saw and then downloaded 18 other files from LabMD's computer. Tiversa's purpose was to confirm the identity and address of the owner of the 1718 File.

- Tiversa never found the 1718 File anywhere other than on a LabMD computer.

- In April 2008, Tiversa reported to CIGNA (the "First Forensic Report," identified above), one of its customers, that Tiversa had located LabMD's

1718 File on a LabMD computer at a LabMD IP address near Atlanta, Georgia.

- Tiversa reported the "disclosure" of the 1718 File to CIGNA in the hope that CIGNA would pressure LabMD to become a Tiversa client.

- It was Tiversa's practice to create Incident Record Forms for Boback and others at Tiversa to use as a list of prospective customers. Tiversa would make cold calls to the prospective companies to describe the "problem" they were having and to offer Tiversa's remediation services.

-  At Boback's direction, Tiversa employees would manipulate the data in Tiversa's data repositories to make it appear that prospective customers' files had spread to other locations on the peer-to-peer networks. This was often done to give Boback a reason to contact a prospective customer again. Boback would report, for example, that a prospective customer's computer file had spread to computers owned by known identify thieves.

- Tiversa would never tell prospective customers where their files were found. Tiversa would claim that the IP address of the source computers were not recorded. Wallace said this was a lie – Tiversa always knew the IP addresses of the source computers.

- Wallace testified about an exhibit marked as RX 551. This was the list of names and other information on approximately 89 companies that Tiversa created to give to the FTC in response to the civil investigative demand the FTC would serve on The Privacy Institute.  According to Tiversa, all of the companies on this list (the "List," identified above) had experienced data breaches.

- For each company on the List, Tiversa had earlier prepared an Incident Record Form, similar to the one Tiversa sent to CIGNA in April 2008 (the "First Forensic Report").

- Wallace explained that companies on the List were chosen "so that the FTC would contact them and notify them of a data breach and hopefully we would be able to sell our services to them."

- In the fall of 2009, Wallace, Boback and other Tiversa employees travelled to Washington, D.C. to discuss the File with the FTC.

- After their return from D.C., Boback contacted people on the List to tell them that the FTC would be taking action against them if they did not become Tiversa clients.

- Boback told Wallace to include LabMD on the List in retaliation for LabMD not hiring Tiversa.

- At some point before Boback's deposition on November 21, 2013, Boback told Wallace to change the data in Tiversa's data store to make sure that the 1718 File did not appear to have come from the Atlanta area.

- Boback directed Wallace "that under no circumstances can the insurance aging file originate from a Georgia IP address or an Atlanta area IP address. And in addition to that, [Boback] told [Wallace] to find an individual in San Diego to include with this list."

- Also in November 2013, Boback directed Wallace to prepare CX0019. The addresses were of known identify thieves.

A true and correct copy of CX0019 is attached hereto, marked as Exhibit R and incorporated herein by reference.

### 6.    Pennsylvania Action

335.    On January 21, 2015, approximately four (4) months before Wallace testified in the Enforcement Action, LabMD filed its complaint in *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No.

2:15-cv-00092-MRH-MPK (the "Pennsylvania Action"). LabMD's complaint includes counts for conversion, defamation, tortious interference with business relations, fraud, negligent misrepresentation, civil conspiracy, federal RICO (18 U.S.C. § 1962(c)), federal RICO (18 U.S.C. § 1962(d)), punitive and treble damages and attorneys' fees and expenses of litigation.

336.  All of the allegations in the original complaint (Dkt. #1), the RICO Statement (Dkt. ##18, 19) and LabMD's First Amended Complaint (Dkt. #125) in the Pennsylvania Action are incorporated herein by reference.

337.  Motions filed by Tiversa and Boback have prevented any discovery in the Pennsylvania Action to date.

**G.   Tiversa's Active Concealment of Wrongdoing**

**1.   Frauds in Georgia Action**

338.  Hansberry, as an individual and as a partner in Pepper Hamilton, was counsel of record for Tiversa and Boback in the Georgia Action.

339.   Kline, who had just moved from Morgan Lewis to Pepper Hamilton in the fall of 2011, represented Tiversa in the Georgia Action although not as counsel of record.

340.  Kline's role in the Georgia Action was partially revealed on July 21, 2014, at a hearing in the Federal Defamation Action, when the court asked who

represented Tiversa in the Georgia Action. Tiversa's counsel from Reed Smith responded by saying, "Eric Kline, Your Honor, and John Hansberry represented Tiversa in the action that was filed against Tiversa by LabMD in the Northern District of Georgia."

341. On November 30, 2011, and shortly thereafter, in filings prepared by Boback, Tiversa, Hansberry, Kline and others at Pepper Hamilton, Tiversa moved to dismiss all claims against it in the Georgia Action for, *inter alia*, lack of personal jurisdiction. *See, e.g.,* Dkt. ##5, 5-1, 8, 8-1 and 19 in the Georgia Action (District Court) ("Motion to Dismiss").

a. **Fraudulent Boback Statements**

342. On December 1, 2011, Tiversa filed a declaration of Boback, its chief executive officer, in support of its Motion to Dismiss (the "Boback Declaration").

343. Boback, Tiversa, Hansberry, Kline and others at Pepper Hamilton prepared the Boback Declaration, which Tiversa filed in the Georgia Action on December 1, 2011, along with a supplemental brief (Dkt. ##8 and 8-1 (District Court)).

344. Under penalty of perjury pursuant to 28 U.S.C. § 1746, Boback declared in Paragraph No. 10 of the Boback Declaration, "Tiversa does not regularly solicit business in Georgia."

345.   Under penalty of perjury pursuant to 28 U.S.C. § 1746, Boback declared in Paragraph No. 15 of the Boback Declaration, "Neither Tiversa nor any of its employees or agents have ever conducted any business in Georgia, engaged in a persistent course of conduct in Georgia or derived any revenue from the rendition of services in Georgia, and particularly in any way related to the allegations of LabMD, Inc. ("LabMD") in the Complaint."

346.   The referenced statements from Paragraph Nos. 10 and 15 of the Boback Declaration will hereinafter be referred to as the "Boback Statements."

347.   On February 10, 2012, Tiversa filed a reply brief in support of its Motion to Dismiss (Dkt. #19 (District Court)) ("Tiversa's Reply Brief"). Hansberry, Kline and others at Pepper Hamilton who prepared that brief adopted and relied upon the Boback Statements on p. 6 of Tiversa's Reply Brief:

> As set forth in Tiversa's prior brief and the accompanying Boback Declaration, Tiversa's only solicitation of business to date in the state of Georgia consists of the one phone call and eight emails to LabMD described in the Complaint.  These nine contacts to one potential customer over a two month period over two and half years ago cannot reasonably be deemed regular solicitation of business in the state of Georgia.

348.   Boback and Tiversa and, on information and belief, Kline, Hansberry and Pepper Hamilton knew that the Boback Statements were false at the time they included those in the Boback Declaration because these defendants knew (and failed to disclose) that:

- Tiversa had solicited business from at least five other companies in Georgia;

- Boback, Kopchak, Wallace, at least one other Tiversa employee and Adams traveled to Atlanta in March, 2010, for several days to network and solicit business for Tiversa at the FBI-LEEDA's 19th Annual Executive Training Conference held at the Marriott Marquis in downtown Atlanta on March 29-31, 2010;

- Boback and Adams spoke at the morning session of the conference on March 31, 2010;

- During the trip to Atlanta in March 2010, Boback arranged for a meeting at CNN headquarters with Robin Meade, the lead anchor at HLN (formerly Headline News) to obtain publicity for Tiversa. Boback arranged the meeting through the husband of Natasha Curry (HLN's Weekend Express with Natasha Curry, fill-in host for Robin Meade on Morning Express with Robin Meade). Ms. Curry's husband had been a firefighter. Boback appealed to Ms. Curry's husband with information about a disclosure of personal information on Atlanta firemen, allegedly discovered by Tiversa. Boback tried to get Ms. Meade and others at HLN interested in covering a story that would highlight Tiversa as the company that discovered the security breach of the firemen's personal information.

- Clark solicited business on Tiversa's behalf at the Masters Golf Tournament in Augusta, Georgia in April 2009.

349. The Boback Statements were false, were known by Boback and Tiversa and, on information and belief, Kline, Hansberry and Pepper Hamilton to be false, were intended to deceive the District Court and did, in fact, deceive the Honorable J. Owen Forrester as revealed in the following findings from Judge Forrester's August 15, 2012 Order granting Tiversa's Motion to Dismiss:

Tiversa avers that it has no customers in Georgia, does not provide any services in Georgia, and has derived no revenue from business activities in Georgia. Tiversa argues that one telephone contact and eight email contacts do not rise to the level of "regularly" soliciting business in Georgia. The court agrees. These limited contacts between Tiversa and LabMD – one telephone call and eight emails – are insufficient to establish that Tiversa regularly solicits business in Georgia. The word "regular" is defined as "recurring, attending, or functioning at fixed or uniform intervals." WEBSTER'S NEW COLLEGIATE DICTIONARY 992 (9th ed. 1990). It implies a pattern of behavior. There is no evidence of any pattern of Tiversa soliciting business from Georgia businesses and residents. There is no evidence that Tiversa contacts Georgia businesses and residents every few weeks or months or even once a year to attract new clients.

350.  Boback, Tiversa, Kline, Hansberry and Pepper Hamilton transmitted or authorized to be transmitted the Boback Declaration in the mail and via wire from Pittsburgh, Pennsylvania to Atlanta, Georgia on or about December 1, 2011, in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-72 (Subornation of Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

351.  Boback, Tiversa, Kline, Hansberry and Pepper Hamilton transmitted or authorized to be transmitted Tiversa's Reply Brief in the mail and via wire from Pittsburgh, Pennsylvania to Atlanta, Georgia on or about February 10, 2012, in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18

U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-72 (Subornation of Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

352.   On August 28, 2012, LabMD filed in the Georgia Action a notice of appeal to the United States Court of Appeals for the Eleventh Circuit where the appeal was styled *LabMD, Inc. v. Tiversa, Inc., Trustees of Dartmouth College and M. Eric Johnson*, in the United States Court of Appeals for the Eleventh Circuit, Appeal No. 12-14504.

353.   On November 16, 2012, Tiversa filed in the Eleventh Circuit, its Brief of Appellee Tiversa, Inc. in support of its request for affirmance  ("Tiversa's Appellate Brief").   Hansberry, Kline and others at Pepper Hamilton prepared Tiversa's Appellate Brief.

354.   As in the District Court, the Boback Statements relied upon by Tiversa in its Appellate Brief were false, were known by Boback and Tiversa and, on information and belief, Kline, Hansberry and Pepper Hamilton to be false, were intended to deceive the Eleventh Circuit Court and did, in fact, deceive that Court as revealed in the following findings from that Court's opinion dated

February 5, 2013, wherein it affirmed the District Court's grant of Tiversa's

Motion to Dismiss:

> Tiversa's contact with Georgia consisted of one phone call and nine emails
> to LabMD. Such contact is not enough under Georgia law to subject Tiversa
> to personal jurisdiction in Georgia courts. See Gust, 257 Ga. at 130; ETS
> Payphone, 236 Ga. App. at 715-16.
>
> * * *
>
> And, although Tiversa's business involves the global searching of computer
> networks, this circumstance alone is also not enough to establish personal
> jurisdiction.

*LabMD, Inc. v. Tiversa, Inc*., 509 Fed. Appx. 842, 845 (11th Cir. 2013).

355.  Kline, Hansberry, Pepper Hamilton, Boback and Tiversa transmitted

or authorized to be transmitted Tiversa's Appellate Brief in the mail and via wire

from Pittsburgh, Pennsylvania to Atlanta, Georgia on or about November 12, 2012,

in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18

U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. §

16-10-72 (Subornation of Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering

Activity), among other crimes.  As a proximate result of these violations, LabMD

and Daugherty have been harmed in amounts to be proven at trial.

b.    **Fraudulent Pepper Hamilton Statements**

356.   Hansberry, Kline and others at Pepper Hamilton made the following statements in fn. 4 on p. 7 of Tiversa's Reply Brief filed in the Georgia Action on or about February 10, 2012:

> Here, it is undisputed that Tiversa did not hack any computers, did not somehow target LabMD or even know where LabMD and its servers were located when it downloaded the 1,718 File.

357.   Hansberry, Kline and others at Pepper Hamilton made the following statements in Tiversa's Appellate Brief on or about November 19, 2012:

- P. 9 – "Tiversa's only contact with Georgia is one phone call and eight emails placed to LabMD during the period of May through July 2008."

- P. 14 – "Tiversa has no customers and conducts no business in Georgia, and its only effort ever to solicit business in Georgia – consisting of one phone call and eight emails to LabMD during a two-month period over four years ago – does not constitute "regularly" soliciting business."

- Pp. 14-15 – "Tiversa did not target or direct its activities at the State of Georgia. Instead, it downloaded a publicly available file from a P2P filesharing network without knowledge of the file's location."

- P. 18 – "In this case, Tiversa did not do or fail to do anything within the State of Georgia."

- P. 29 – "Here, it is undisputed that Tiversa did not hack any computers, did not somehow target LabMD or even know where LabMD and its servers (if it even had servers) were located when it downloaded the 1,718 File."

358.   The statements from Tiversa's Reply Brief and Tiversa's Appellate Brief in the two paragraphs above will hereinafter be referred to as the "Pepper Hamilton Statements."

359.   Boback and Tiversa and, on information and belief, Kline, Hansberry and Pepper Hamilton knew that the Pepper Hamilton Statements were false at the time those statements were made not only because of what they knew about the falsities in the Boback Declaration as alleged above but also because these defendants knew the following:

- In February 2008, Tiversa hacked the 1718 file and other computer files directly from a LabMD computer in Atlanta, Georgia.

- Tiversa recorded the IP address and port of the LabMD computer it hacked.

- Tiversa first hacked the 1718 File by, inter alia, instructing its computer in Pittsburgh to target and utilize the "push" feature of software on LabMD's computer to capture and push the 1718 File through LabMD's firewall in Atlanta, Georgia to Tiversa's computer in Pittsburgh.

- After the 1718 File was "pushed" from LabMD's computer to Tiversa's computer in Pittsburgh, Tiversa then viewed and stored the 1718 File.

- After Tiversa downloaded and viewed the 1718 File, it then instructed its computer in Pittsburgh to target and utilize the "browse host" feature of software on LabMD's computer to learn that 18 other files could be taken from the LabMD computer.

- Tiversa targeted the LabMD computer for more files because Tiversa was particularly interested in obtaining medical files and knew that LabMD was a medical testing facility.

- Tiversa then instructed its computer in Pittsburgh to target and utilize the "push" feature of software on LabMD's computer to capture and push eighteen (18) other files through LabMD's firewall in Atlanta, Georgia to its computer in Pittsburgh.

- Tiversa then confirmed from a review of LabMD's 19 files that the owner of the files was LabMD and that LabMD was located in Atlanta, Georgia.

360.   The Pepper Hamilton Statements were false, were known by Boback and Tiversa and, on information and belief, Kline, Hansberry and Pepper Hamilton to be false, were intended to deceive the District Court and the Eleventh Circuit and did, in fact, deceive those Courts as revealed in their findings set forth above.

361.   Kline, Hansberry, Pepper Hamilton, Boback and Tiversa transmitted or authorized to be transmitted Tiversa's Reply Brief containing the Pepper Hamilton Statements in the mail and via wire from Pittsburgh, Pennsylvania to Atlanta, Georgia on or about February 10, 2012, in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-72 (Subornation of Perjury)  and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other

crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

362.  Kline, Hansberry, Pepper Hamilton, Boback and Tiversa transmitted or authorized to be transmitted Tiversa's Appellate Brief containing the Pepper Hamilton Statements in the mail and via wire from Pittsburgh, Pennsylvania to Atlanta, Georgia on or about November 12, 2012, in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-72 (Subornation of Perjury)  and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

363.  The Georgia Action would not have been dismissed but for the Boback Statements, the frauds contained therein and the District Court and Eleventh Circuit's reliance upon those frauds.

364.  LabMD would not have filed or needed to file the Pennslvania Action but for the Boback Statements, the frauds contained therein and the District Court and Eleventh Circuit's reliance upon those frauds.

365.  LabMD would have learned of all Defendants' wrongdoing through discovery in the Georgia Action but for the Boback Statements, the frauds

contained therein and the District Court and Eleventh Circuit's reliance upon those frauds. Instead, Defendants' wrongdoing was intentionally and actively concealed by those frauds. As an example, LabMD would have learned through discovery in the Georgia Action the truths disclosed by whistleblower and former Tiversa employee Richard E. Wallace on and after April 2, 2014 (as set forth elsewhere in this Complaint).

366.   The Georgia Action would not have been dismissed but for the Pepper Hamilton Statements, the frauds contained therein and the District Court and Eleventh Circuit's reliance upon those frauds.

367.   LabMD would not have filed or needed to file the Pennslvania Action but for the Pepper Hamilton Statements, the frauds contained therein and the District Court and Eleventh Circuit's reliance upon those frauds.

368.   LabMD would have learned of all Defendants' wrongdoing through discovery in the Georgia Action but for the Pepper Hamilton Statements, the frauds contained therein and the District Court and Eleventh Circuit's reliance upon those frauds. Instead, Defendants' wrongdoing was intentionally and actively concealed by those frauds. As an example, LabMD would have learned through discovery in the Georgia Action the truths disclosed by whistleblower and former Tiversa

employee Richard E. Wallace on and after April 2, 2014 (as set forth elsewhere in this Complaint).

### 2.    Tiversa's Counsels' Misrepresentations and Threats

369.   In November 2012, Hansberry and Pepper Hamilton sent a letter to LabMD's general counsel in connection with the Georgia Action.   The letter included the following statements, which Tiversa and Boback and, on information and belief, Kline, Hansberry and Pepper Hamilton knew to be false at the time they were made:

> In our conversation, you also described an FTC investigation of LabMD. We were previously unaware of any such investigation.  You explained that LabMD believes that Tiversa is somehow complicit in the FTC's investigation because the FTC investigation came after LabMD decided it would not hire Tiversa. LabMD's accusation is patently false and baseless.

> Critically, and contrary to your clients' published false statements, Tiversa did not break into LabMD's system.  Tiversa is not a "thief." Mr. Daugherty and LabMD know that these specific accusations are false.  As I said to you on the phone, we are willing to sit down and further demonstrate what you and Mr. Daugherty already know through publically available documents: namely, that the file in question could be found and today can still be found at multiple sites in the public domain.

A true and correct copy of Hansberry's November 8, 2012 letter is attached hereto, marked as Exhibit S and incorporated by reference herein.

370.   Hansberry concluded his November 8, 2012 letter with the following threat:

For all of the foregoing reasons, Tiversa now demands that LabMD immediately take down and cease publishing such false statements against Tiversa. Tiversa further demands that Mr. Daugherty in particular refrain from publishing any book with the false statements alluded to through his social media outlets. Please be advised that Tiversa will take the necessary steps to fully protect its interests. If LabMD, Mr. Daugherty, and/or Mr. Daugherty's upcoming book continues to propagate false information about the Tiversa business, Tiversa will be forced to file suit for trade libel, defamation, and tortious interference with prospective and existing contractual relations, and will immediately seek injunctive and monetary relief to prevent further harm or attempts to harm Tiversa's interests, among other remedies.

371.  Kline, Hansberry, Pepper Hamilton, Boback and Tiversa transmitted or authorized to be transmitted Hansberry's November 8, 2012 letter in the mail and via wire from Pittsburgh, Pennsylvania to Atlanta, Georgia on or about November 8, 2012, in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

372.  Tiversa and Boback followed through on Hansberry's threat when they filed the Federal Defamation Action on September 5, 2013.

373.  In a letter dated October 17, 2013, to LabMD's counsel, Reed Smith attorney Jarrod Shaw (representing Tiversa and Boback) made the following misrepresentations, which Tiversa and Boback knew to be false at the time they were made:

Defendants [LabMD and Daugherty] have made a host of statements

125

regarding a file which was leaked from LabMD's medical testing facility (the "File"). Specifically, the Defendants have stated in many different mediums, both written and oral, that the File was taken, by Tiversa and Mr. Boback, directly from a LabMD computer, and used in an attempt to extort the Defendants due to the sensitive nature of the information on the File. When this attempt failed, allege the Defendants, the Plaintiffs then gave the File to the Federal Trade Commission ("FTC").

[T]he evidence will indisputably show that Tiversa and Mr. Boback did not access, take, "invade" or ever obtain the File through a LabMD computer. Instead, as a result of a LabMD computer downloading Limewire and making its files accessible to the peer-to-peer network, the File was shared with and downloaded by individuals that connected with LabMD's File.

Moreover, the evidence will also show that the Plaintiffs accessed the File through a computer located in San Diego - and not the LabMD Computer - with an Internet Protocol Address of 68.107.82.250. Thus, any and all statements asserting or implying that the Plaintiffs accessed the File through a LabMD computer are demonstrably incorrect; the File had already been shared on the peer-to-peer network by LabMD at the time Tiversa and Mr. Boback came across it in February 2008.

A true and correct copy of Shaw's October 17, 2013 letter is attached hereto, marked as Exhibit T and incorporated by reference herein.

374.    Shaw's October 17, 2013 letter was the *first* communication that LabMD ever received, from anyone, evidencing Tiversa's Fraudulent Statements Regarding Source, Disclosure, Spread and Bad Actors by LabMD.  At that time, however, LabMD had no reason to know (1) whether the statements were true or false, (2) whether the statements had been made to the FTC and, (3) even if LabMD had reason to the believe that the statements *had been* made to the FTC

and *were* false, LabMD could not have proved the falsity of any of those statements without discovery in a lawsuit or whistleblowing from a Tiversa insider like Wallace.

375.   Boback and Tiversa authorized Shaw to transmit his October 13, 2013 letter to LabMD's counsel, in the mail and via wire, from Pittsburgh, Pennsylvania to Atlanta, Georgia on or about October 13, 2013, in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

### 3.    Tiversa Concealed Exculpatory Evidence

#### a.    Compulsory Processes

376.   As noted above, In July 2009, the FTC served the First Subpoena on Tiversa ostensibly through The Privacy Institute.  A true and correct copy of the First Subpoena is attached hereto, marked as Exhibit U and incorporated herein by reference.

377.   On September 30, 2013, in the Enforcement Action, the FTC served a *subpoena ad testificandum* and a *subpoena duces tecum* on Tiversa (the "Second Subpoena").  A true and correct copy of the Second Subpoena is attached hereto, marked as Exhibit V and incorporated herein by reference.

378.   On June 3, 2014, Congress issued a subpoena to Tiversa compelling it to produce certain documents (the "Third Subpoena").

b.   **First Forensic Report**

379.   Shortly before Wallace testified in the Enforcement Action on May 5, 2015, LabMD saw Tiversa's April 18, 2008 Incident Response Form (Tiversa's "First Forensic Report," identified above) for the first time.

380.   Tiversa admits in the First Forensic Report that it found the 1718 File on a LabMD computer at LabMD's IP address in Atlanta, Georgia *and nowhere else*.

381.   Tiversa refused to produce the First Forensic Report in response to the First and Second Subpoenas.

382.   Tiversa successfully, actively and fraudulently concealed Tiversa's First Forensic Report from LabMD and others.

383.   Tiversa's conduct violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### c.    Second Forensic Report

384.    Shortly before Wallace testified in the Enforcement Action on May 5, 2015, LabMD saw Tiversa's August 12, 2008 Forensic Investigation Report to CIGNA (Tiversa's "Second Forensic Report," identified above) for the first time.

385.    As noted above, Tiversa admits in the Second Forensic Report that it found the 1718 File on a LabMD computer at LabMD's IP address in Atlanta, Georgia.

386.    Tiversa refused to produce the Second Forensic Report in response to the First, Second and Third Subpoenas.

387.    Tiversa successfully, actively and fraudulently concealed Tiversa's Second Forensic Report until shortly before the whistleblower's testimony.

388.    Tiversa's conduct violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### d.    Internal Email

389.    In the OGR Report, LabMD saw for the first time portions of an internal email dated September 5, 2013, from Boback to Kopchak, Tiversa's chief financial officer, and Trunzo, secretary to Tiversa's board of directors (Tiversa's

"Internal Email"). A true and correct copy of the Internal Email is attached hereto, marked as Exhibit W and incorporated herein by reference.

390. Boback admits in the Internal Email that the 1718 File originated and that Tiversa took the file directly from a LabMD computer in Atlanta, Georgia in 2008.

391. Tiversa refused to produce the Internal Email in response to the Second Subpoena.

392. Tiversa successfully, actively and fraudulently concealed Tiversa's Internal Email until it was produced to Congress.

**H.    Tiversa's Perjured Testimony**

**1.    Congress 2007**

393. Boback, after having been administered a lawful oath or affirmation, committed the offense of perjury and obstructed justice when he knowingly and willfully made the following false statements material to the issue or point in question at the July 24, 2007 hearing before the Oversight Committee on the topic of Inadvertent File Sharing Over Peer-to-Peer Networks:

> In doing so—and this is what is most astounding to most individuals—we are processing 300 million searches per day. For perspective's sake, Google processes 130 million searches per day. This is a massive network with many searches issued worldwide.

394.    Tiversa and Boback's conduct violated 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.    As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 2.    Congress 2009

395.    Boback, after having been administered a lawful oath or affirmation, committed the offense of perjury when he knowingly and willfully made the following false statements material to the issue or point in question at the May 5, 2009 hearing before the U.S. House of Representatives Subcommittee on Commerce, Trade and Consumer Protection Committee of the Committee on Energy and Commerce regarding H.R. 2221 (The Data Accountability and Protection Act) and H.R. 1319 (The Informed P2P User Act):

- [I]n the last 60 days Tiversa has downloaded breaches in the amount of 3,908,000 breaches, individual breaches in the last 60 days.

- From Tiversa, we process 1.6 billion searches per day every day.

- We did a study with the Today show showing that in that instant 275,000 tax returns were found in one search on the peer-to-peer, so a minimum of 275,000 Social Security numbers on one time.

- I will tell you that as we find these breaches, these 3,900,000 breaches, as we can we return the information and alert the companies to the breach.

> Again, we do it out of our duty of care policy. There are no strings attached to that.

396.  Tiversa and Boback's conduct violated 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 3.    Congress 2009

397.  Boback, after having been administered a lawful oath or affirmation, committed the offense of perjury when he knowingly and willfully made, in his written statements, the following false statements material to the issue or point in question at the July 29, 2009 hearing before the Oversight Committee on the topic of File Sharing Over Peer-to-Peer Networks: How it Endangers Citizens and Jeopardizes National Security:

> In February of this year, Tiversa identified an IP address on the P2P networks, in Tehran, Iran, that possessed highly sensitive information relating to Marine One. This information was disclosed by a defense contractor in June 2008 and was apparently downloaded by an unknown individual in Iran.

398.  Tiversa and Boback's conduct violated 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these

violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 4.    Congress 2014

399.   The OGR Committee interviewed Boback on June 5, 2014, in connection with its investigation into Tiversa's business practices and Tiversa's relationship with the FTC.   In the OGR Report, the OGR Committee made the following findings after considering the sworn testimony of Boback in combination with other evidence:

- Boback provided false testimony about fabricated documents to the U.S. House of Representatives.

- The Committee found that, contrary to Boback's statements about Schmidt's role at Tiversa, Schmidt actively sought out contracts and potential clients for the company.  This is yet another example of Boback providing false information during the course of this investigation.

- During the course of its investigation, the Committee routinely found that it could not take information provided by Tiversa at face value—and statements made by former employees indicate that clients and potential clients could not do the same.   The Committee found that Boback's statements about Tiversa's technological capabilities simply did not match what it found in the documents and testimony, Boback created a hostile work environment, withheld the nature of his relationship with Richard Wallace from the Committee, and created a culture at Tiversa based on a series of unseemly business practices.  The Committee found that information provided by Tiversa—such as that on the Marine One leak—not only could not be verified, but at times appeared to be outright false.  Given all the Committee has learned about Boback and Tiversa,

the extent of its relationship with the Federal Trade Commission is extremely concerning.

- In addition, Tiversa's involvement with LabMD, a medical testing laboratory based in Atlanta, Georgia, raises questions. Not only does LabMD's story offer a case study illustrating Tiversa's coercive business practices and relationship with the FTC, but information the Committee obtained shows that Boback lied about material information in the case, which ultimately led to the shuttering of LabMD.

400. Tiversa and Boback's conduct violated 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes. As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 5.  Georgia Action

401. Boback, after having been administered a lawful oath or affirmation, committed the offense of perjury and obstruction of justice when he knowingly and willfully made false statements material to the issue or point in question as set forth in Brief in Support of Plaintiff's Rule 60(d)(3) Motion for Relief from Judgment filed in the Georgia Action on January 29, 2016, a true and correct copy of which is attached hereto, marked as Exhibit X and incorporated herein by reference.

402.   Tiversa and Boback's conduct violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 6.    State Court Defamation Action

403.   Boback committed the offense of perjury when he knowingly and willfully made the following false statements material to the issue or point in question in his verified complaints in the State Court Defamation Action filed on October 31, 2014, March 9, 2015 and September 8, 2015:

- The File was available to Tiversa and others only because a LabMD computer had downloaded Lime Wire, a P2P sharing application, no later than 2006.

- The File was downloaded by Tiversa from various IP addresses.

- The File was available on these networks because LabMD downloaded Lime Wire on one of its computers making the File available to the public.

- Tiversa refused to produce anything directly to the FTC.

- In August of 2009 the Privacy Institute responded to the CID and provided responses including a spreadsheet that contained, inter alia, information related to companies that had file-shared documents containing PII and PHI.

404.   Tiversa and Boback's conduct violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### 7.   FTC Enforcement Action

### a.   November 21, 2013 Testimony

405.   Boback, after having been administered a lawful oath or affirmation, committed the offense of perjury when he knowingly and willfully made the following false statements material to the issue or point in question at his deposition taken on November 21, 2013, in the Enforcement Action:

A. We also, prior, several weeks ago, we also performed a search to find the 1,718, document to find, if it was located anywhere else through the peer-to-peer networks.

Q. And what did you find out?

A. We found this [the 1718 File] in multiple locations.

Q. What is the significance of the IP address, which is 68.107.85.250?

A. That would be the IP address that we downloaded the file from, I believe.

Q. Going back to CX 21. Is this the initial disclosure source?

A. If I know that our initial disclosure source believed that that was it, yes. I don't remember the number specifically, but if that IP address resolves to

San Diego, California, then, yes, that is the original disclosure source.

A. Anyone else could have found the file as well.

A. Tiversa found the file from a San Diego IP address, which, as we've discovered, is probably not the original source. So, therefore, Tiversa could have found the file from any of the other disclosing sources, just as anyone else could still to this day, find the file from any number of sources.

A. It is the same answer as before. Yes, we probably could have, because other computers had the same disclosing file. So, if we didn't find it from San Diego, we could have certainly found it from some other location, as today we have found it from multiple locations. So, whether San Diego was disclosing it or not, we would still find the file and others would as well.

A. From CX 10? I don't know if it is from the initial disclosure source or a secondary disclosure source, but, yes, we have additional locations of this document outside of the Atlanta IP address.
What information do you have?

A. We have a series of IP addresses that also possess this 1,718 document or this, whatever the Exhibit is.

Q. So, what is this document?

A. It appears to be a portion of a larger file, listing a number of companies, but, again, redacted to just show LabMD, the file title, the PRX and IP address and date of disclosure [this document is referred to elsewhere in this Complaint as the "List"].

Q. How is this document created?

A. The entire document was created by doing searches internally in Tiversa's system to locate organizations that disclosed large sums of personally identifiable information.

A. We know that the file in early February, prior to this February 25 date, was downloaded from the 68.107.85.250.

137

Q. There is an IP address there in that title of the document. It is 173.16.83.112. What is that?

A. That would be the IP address that we would have downloaded this file [the 1718 File] from.

Q. What IP address was it [the 1718 File] downloaded from?

A. 201.194.118.82.

A. On the third listing, the 201.194.118.82 was downloaded by Tiversa on April 7, 2011 at 2:22 a.m.

Q. What is it [CX 19 – also referred to in this Complaint as the "Third Forensic Report"]?

A. It is a listing of the IP addresses and the times of downloads of the four instances that Tiversa has in our data store of the 1,718 file.

Q. How is Exhibit CX 19 created?

A. We did a search in FAST, our internal system, to determine all the locations, or all the instances of the times that we've downloaded the insurance aging document, the 1,718 file and the dates and times and the IP addresses that we located those from.

Q. What IP address was it [CX 11] downloaded from?

A. 90.215.200.56.

A. I'm sorry[,] Tiversa downloaded the CX 11 file exhibit on June 9, 2011, at 8:13 a.m.

Q. Are the date and time on each line, the date and time when Tiversa downloaded the file?

A. Yes.

Q. So, for example, the 173.16.83.112 insuranceaging_6.05.071 was downloaded on November 5, 2008, at 11:26 p.m., correct?

A. Correct.

Q. Mr. Boback, I'm going to represent to you that you produced Exhibit 18 [a LabMD daily credit card transaction file] to us with a file name that was, bracket, 71.62.145.247, end bracket, daily credit card transactions.pdf with a Bates number of Tiversa-FTC_response-006904. Are you familiar with that IP address?

A. I am. That sounds -- if I reported to you on that, that is the IP address that we downloaded this address from.

A. Clarify, yes. In 2008, when working for another client, we were attempting to identify the original disclosure source of the file that we discovered from the San Diego IP address. So, we issued a hash based search on that file. We could not confirm at that time that it belonged to LabMD. Someone could have put LabMD on it. We didn't know that it was a LabMD file at the time, even though it said that on the top of the document, LabMD. We were trying to identify is there any other source, because our client, whose information was listed into this file, would want to know, where did this come from, mainly, because they were concerned, did it come from them, frankly. And we wanted to find out if that was the case, so –

Q. The e-mail goes on to say they may or may not have been successful in downloading the file?

A. Yes.

Q. Do you know, does Tiversa know if a file was downloaded?

A. Yes, Tiversa knows that the file was downloaded, subsequently, at the -- and we downloaded it from others who had downloaded it from them, or from someone.

139

Q. Is Exhibit 0200 a true and accurate copy of the certification of records of regularly conducted activity?

A. It is.

Q. Does the certification apply to all of the documents that Tiversa has produced pursuant to the subpoena?

A. It does.

A true and correct copy of the transcript from Boback's November 21, 2013 deposition in the Enforcement Action is attached hereto, marked as Exhibit Y and incorporated herein by reference.

406.   Tiversa and Boback's conduct violated 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.   As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

b.   **June 7, 2014 Testimony**

407.   Boback, after having been administered a lawful oath or affirmation, committed the offense of perjury when he knowingly and willfully made the following false statements material to the issue or point in question at his deposition taken on June 7, 2014, in the Enforcement Action:

140

Q. You [Boback] didn't tell him [Wallace] to make any IP addresses for the 17818 [sic] file, did you?

A. Absolutely not.

Q. How did Tiversa come to have this knowledge about these companies [on the List]?

A. Tiversa provides security services on file sharing networks in which it is quite common to see large disclosures of social security numbers on these networks. And pursuant to the CID that went to the Privacy Institute, Tiversa searched Tiversa's data store for anything responsive of that CID, created the spreadsheet, provided the spreadsheet to the Privacy Institute. And, then, the Privacy Institute, pursuant to the CID, provided it to the FTC, to the best of my knowledge.

Q. Now, Mr. Boback, isn't it true that Tiversa actually downloaded the 1718 file from a workstation at LabMD in Atlanta, Georgia?

A. I have no knowledge of that.

A. Mr. Tagliaferri found, located these sources listed on CX-19 [the Third Forensic Report], all of the sources that were provided as spread on CX-19 as well as, I believe, three additional IP addresses.

Q. Am I correct that Mr. Tagliaferri's spread of the 1718 file [the Fourth Forensic Report] concluded that in addition to the four IP addresses identified in CX-19, that Tiversa also identified three additional IP addresses at which the 1718 file had been -- from which the 1718 file had been downloaded?

A. You are correct.

A. In the normal course of our business, Tiversa downloaded the 1718 file from file sharing networks as it matched a search term for one our current clients, one of our clients.

A. I know that we have, or it is my understanding that we have downloaded

it from the four IP addresses listed on CX-19 as well as three additional IP addresses.

A. So, it was found at seven different IP addresses, so there were multiple files at different IP addresses.

Q. Was CX-958 -- well, how did Tiversa come to possess CX-958?

A. Mr. Tagliaferri at Tiversa, it is my understanding that Mr. Tagliaferri at Tiversa did a search for a LabMD in the Tiversa data store. And this was one of the resulting downloads or one of the resulting matches to the search. It is not a download.

A true and correct copy of the transcript from Boback's June 7, 2014 deposition in the Enforcement Action is attached hereto, marked as Exhibit Z and incorporated herein by reference.

408.   Tiversa and Boback's conduct violated 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.   As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

       c.   **April 17, 2015 Testimony**

409.   Chopra (as an individual and representative of Tiversa), after having been administered a lawful oath or affirmation, committed the offense of perjury when she knowingly and willfully made the following false statements material to

the issue or point in question in an affidavit dated April 17, 2015 (the "Chopra Affidavit") filed in the Enforcement Action:

### Proposed Exhibit CX1007

4.    I have reviewed Proposed Exhibit CX1007 and the email contains the following metadata:

- Proposed Exhibit CX1007 was created using Microsoft Exchange Version 6.5.

- Proposed Exhibit CX1007 was created on November 6, 2012 at 4:05 PM.

- Proposed Exhibit CX1007 was sent from "Rick Wallace" rwallace@tiversa.com to "Rick Wallace" rwallace@tiversa.com.

- Proposed Exhibit CX1007 is part of a .pst file which was originally stored on Mailstore-Folder-UTF7: rwallace/Exchangerwallace/Sent Items.

### Proposed Exhibit CX1008

5.    I have reviewed Proposed Exhibit eXJ008 and the email contains the following metadata:

- Proposed Exhibit CX1008 was created using Microsoft Exchange Version 6.5.

- Proposed Exhibit CX1008 was created on November 9, 2012 at 12:08 PM.

- Proposed Exhibit CX1008 was sent from "Rick Wallace" rwallace@tiversa.com to "Robert Boback" rboback@tiversa.com.

- Proposed Exhibit CX1007 is part of a .pst file which was originally stored on Mai1Store-Folder-UTF7: admin/Exchange rboback/lnbox.

• Proposed Exhibit CX1008 attaches a .doc file named "LAB MD Spread".

**Proposed Exhibit CX1009**

7.      Proposed Exhibit CX1009 was attached to the e-mail described above as Proposed Exhibit CX1008, dated November 9, 2012.

9.      Proposed Exhibit CX1009 was created on November 8, 2012 and last modified on November 9, 2012.

A true and correct copy of Chopra's April 17, 2015 affidavit is attached hereto, marked as Exhibit AA and incorporated herein by reference.

410.   Tiversa and Chopra sent the Chopra Affidavit via mail and wire on or about April 17, 2015.

411.   In producing it to the FTC, via mail and wire and representing the Chopra Affidavit to be true, Tiversa and Chopra's conduct violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

## I.    Fabricated Evidence

### 1.    Third Forensic Report

412.    The FTC took Boback's first deposition in the Enforcement Action on November 21, 2013.  Boback testified, falsely, about CX0019, an exhibit that he alleged was proof that Tiversa had found the 1718 File at four different locations on P2P networks (Tiversa's "Third Forensic Report").  Boback testified, falsely, that Tiversa employee Richard E. Wallace created CX00019 based on his forensic investigations.

413.    The Third Forensic Report is based on evidence fabricated by Tiversa and Boback.

414.    Tiversa and Boback sent the Third Forensic Report via mail and wire on or about November 21, 2013.

415.    In producing it to the FTC, via mail and wire, testifying about it and representing the Third Forensic Report to be true, Tiversa and Boback's conduct violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

2.      **Fourth Forensic Report**

      a.      **Congress 2014**

416.   On June 3, 2014, the OGR Committee issued a subpoena to Tiversa compelling it to produce certain documents.

417.   In response, Tiversa produced a Tiversa document titled "Forensic Investigation Report – LABMD0001," (Tiversa's "Fourth Forensic Report"), via mail and wire.  This report was prepared by Tagliaferri on or about June 4, 2014, outside of the time period specified in the subpoena.  A true and correct copy of the Fourth Forensic Report is attached hereto, marked as Exhibit BB and incorporated by reference herein.

418.   On information and belief, Boback testified about the Fourth Forensic Report during his interview(s) by the OGR Committee.

419.   The Fourth Forensic Report is based on evidence fabricated by Tiversa, Tagliaferri and Boback.

420.    Tiversa and Boback sent the Fourth Forensic Report via mail and wire on or about June 3, 2014.

421.   In producing it to Congress, via mail and wire, testifying about it and representing the Fourth Forensic Report to be true, Tiversa and Boback's conduct violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C.

§ 1503 (Obstruction of Justice), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.  As a proximate result of these violations, LabMD and Daugherty have been harmed in amounts to be proven at trial.

### b.    FTC Enforcement Action

422.  Boback's trial testimony in the Enforcement Action was taken by deposition in Pittsburgh, PA, on June 7, 2014.  Boback testified that the Fourth Forensic Report was proof that Tiversa had located the 1718 File at seven (7) different locations on P2P networks.

423.  The Fourth Forensic Report is based on evidence fabricated by Tiversa, Tagliaferri and Boback.  By producing it in the Enforcement Action, via mail and wire, testifying about it and representing it to be true, Tiversa, Boback and Tagliaferri violated 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S. Code § 1519 (Destruction, Alteration, or Falsification of Records in Federal Investigations), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-10-70 (Perjury) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity), among other crimes.

**J.    FBI Raid**

424.    On March 1, 2016, the FBI raided Tiversa headquarters in Pittsburgh. According to Reuters on March 17, 2016, "Federal agents are investigating whether cybersecurity firm Tiversa gave the government falsified information about data breaches at companies that declined to purchase its data protection services, according to three people with direct knowledge of the inquiry."

425.    Tiversa terminated Boback, the mastermind of the scheme, shortly after the FBI raid.

**CAUSES OF ACTION**

**COUNT I – FEDERAL RICO (18 U.S.C. § 1962(c))**

426.    LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

427.    This Count is against Defendants Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10.[8]

428.    At all relevant times, LabMD and Daugherty are and were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

---

[8] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

429.  At all relevant times, Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 are and were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

430.  Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 were employed by or associated with an "enterprise" engaged in and whose activities affect interstate commerce within the meaning of 18 U.S.C. § 1961(4).  The common purpose of the Enterprise is to commercially benefit by making misrepresentations about data privacy and security breaches to unsuspecting consumers, the media, and the public, and to otherwise engage in tortious activities that advance their purpose.

431.  Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 are each associated with the Enterprise.  Each conducts and participates in the Enterprise's affairs.

432.  Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 agreed to, and knowingly, intentionally, and willfully participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

433.  Said activities have been for the unlawful purpose of harming LabMD and Daugherty.

434. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 intentionally and willingly devised and participated in a scheme to harm Daugherty and LabMD in an effort to deprive LabMD of assets and property, and knowingly and intentionally violated, at a minimum, the following predicate acts: 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1512 (Witness Tampering), 18 U.S.C. § 1513 (Witness Retaliation), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2319 (Criminal Infringement of a Copyright), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-93 (Witness Tampering), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).

### a.    **18 U.S.C. § 1028 (Identity Fraud)**

435. In violation of 18 U.S.C. § 1028(a)(2), Boback, Tiversa and Does 1-10 knowingly transferred identification documents, and/or false identification documents knowing that such documents and features were stolen or produced without lawful authority.

436. In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1028(f).

437. In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1028(f).

438. In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1028(f).

439. In violation of 18 U.S.C. § 1028(a)(7), Defendants Boback, Tiversa and Does 1-10 knowingly transfered, possessed, or used, without lawful authority, one or more means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law.

440.  In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1028(f).

441.  In each of the aforementioned violations under 18 U.S.C. § 1028, Defendants Boback, Tiversa and Does 1-10's production, transfer, possession or use prohibited by this section was in or affected interstate or foreign commerce.

442.  In one or more of the aforementioned violations under 18 U.S.C. § 1028, the means of identification and identification documents were transported in the mail in the course of the production, transfer, possession or use prohibited by this section.

### b.    18 U.S.C. § 1029 (Access Device Fraud)

443.   In violation of 18 U.S.C. § 1029(a)(1), Boback, Tiversa and Does 1-10 knowingly and with intent to defraud produced, used, or trafficked in one or more counterfeit access devices.

444.  In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1029(b)(1) and (2), respectively.

445.  In violation of 18 U.S.C. § 1029(a)(2), Defendants Boback, Tiversa and Does 1-10 knowingly and with intent to defraud trafficked in or used one or more unauthorized access devises during any one-year period, and by such conduct obtained something of value aggregating $ 1,000 or more during that period.

446.  In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1029(b)(1) and (2), respectively.

447.  In violation of 18 U.S.C. § 1029(a)(3), Defendants Boback, Tiversa and Does 1-10 knowingly and with intent to defraud possessed fifteen or more devices that were counterfeit or unauthorized access devices.

448.  In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1029(b)(1) and (2), respectively.

449.  In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan

Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1029(b)(1) and (2), respectively.

450.   In violation of 18 U.S.C. § 1029(a)(5), Defendants Boback, Tiversa and Does 1-10 knowingly and with intent to defraud effected transactions, with one or more access devices issued to another person or persons, and received payment or other things of value during any one-year period the aggregate value of which is equal to or greater than $1,000.

451.   In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1029(b)(1) and (2), respectively.

452.   In violation of 18 U.S.C. § 1029(a)(8), Defendants Boback, Tiversa and Does 1-10 knowingly and with intent to defraud used, produced, trafficked in, had control or custody of, or possessed a scanning receiver.

453.   In addition, Adams, Becker, Boback, Chopra, Clark, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Tiversa, Dartmouth and Does 1-10 attempted and/or conspired to commit this violation in violation of 18 U.S.C. § 1029(b)(1) and (2), respectively.

### c.    18 U.S.C. § 1341 (Mail Fraud)

454.   In violation of 18 U.S.C. § 1341, Defendants Boback, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10, devised and intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, and placed in a post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposited or caused to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or took or received therefrom, any such matter or thing, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it was directed to be delivered by the person to whom it was addressed, any such matter or thing.

### d.    18 U.S.C. § 1343 (Wire Fraud)

455.   In violation of 18 U.S.C. § 1343, Boback, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

155

representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

### e.    **18 U.S.C. § 1344 (Bank Fraud)**

456.   In violation of 18 U.S.C. § 1344, Boback, Tiversa and Does 1-10 knowingly executed, or attempted to execute, a scheme or artifice to defraud one or more financial institutions; or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

### f.    **18 U.S.C. § 1462 (Obscene Matters)**

457.   In violation of 18 U.S.C. § 1462, Boback, Tiversa and Does 1-10 brought into the United States, or any place subject to the jurisdiction thereof, or knowingly used any express company or other common carrier or interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934 [47 USCS § 230(e)(2)]), for carriage in interstate or foreign commerce (1) obscene, lewd, lascivious, or filthy books, pictures, motion-picture films, letters, writings, or other matter of indecent character; or (2) obscene, lewd, lascivious, or

filthy phonograph recordings, electrical transcriptions, or other articles or things capable of producing sound.

458.  In violation of 18 U.S.C. § 1462, Defendants Boback, Tiversa and Does 1-10 knowingly took or received, from an express company or other common carrier or interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934) any matter or thing the carriage or importation of which was unlawful.

### g.    18 U.S.C. § 1503 (Obstruction of Justice)

459.   In violation of 18 U.S.C. § 1503(a), Defendants Boback, Chopra, Hansberry, Kline, Morgan Lewis, Pepper Hamilton, Tagliaferri, Tiversa and Does 1-10 corruptly endeavored to influence, intimidate, or impede an officer in or of a court of the United States.

460.  In violation of 18 U.S.C. § 1503(a), Defendants Boback, Chopra, Hansberry, Kline, Tagliaferri, Morgan Lewis, Pepper Hamilton, Tiversa and Does 1-10 corruptly influenced, obstructed, or impeded the due administration of justice.

461.  In violation of 18 U.S.C. § 1503(a), Defendants Boback, Chopra, Hansberry, Kline, Tagliaferri, Morgan Lewis, Pepper Hamilton, Tiversa and Does

1-10 corruptly endeavored to influence, obstruct, or impede, the due administration of justice.

### h.    18 U.S.C. § 1512 (Witness Tampering)

462.   In violation of 18 U.S.C. § 1512(b), Defendants Boback, Tiversa and Does 1-10 knowingly attempted to use intimidation, attempted to threaten or corruptly persuade another person or engaged in misleading conduct toward another person, with intent to (1) influence, delay or prevent the testimony of any person in an official proceeding, (2) cause or induce any person to withhold testimony, or withhold a record, document, or other object, from an official proceeding; alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or be absent from an official proceeding to which such person has been summoned by legal process; or hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

463.   In violation of 18 U.S.C. § 1512(c), Boback, Tiversa and Does 1-10 corruptly altered, destroyed, mutilated, or concealed a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or otherwise obstructed, influenced, or impeded an official proceeding, or attempted to do so.

464.   In violation of 18 U.S.C. § 1512(k), Boback, Tiversa and Does 1-10 conspired to commit offenses under 18 U.S.C. § 1512.

### i.    18 U.S.C. § 1513 (Witness Retaliation)

465.   In violation of 18 U.S.C. §1513(b), Boback, Tiversa and Does 1-10 knowingly engaged in conduct and thereby caused bodily injury to another person or damaged the tangible property of another person, or threatened to do so, with intent to retaliate against any person for the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer; or attempted to do so.

466.   In violation of 18 U.S.C. §1513(e), Defendants Boback, Tiversa and Does 1-10 knowingly, with the intent to retaliate, took action harmful to a person,

including interference with the lawful employment or livelihood of that person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense.

467.   In violation of 18 U.S.C. §1513(f), Boback, Tiversa and Does 1-10 conspired to commit offenses under this section.

### j.   **18 U.S.C. § 1957 (Money Laundering)**

468.   In violation of 18 U.S.C. § 1957 (a), Defendants Boback, Tiversa and Does 1-10 engaged or attempted to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from the following specified unlawful activities:

### (i)   **18 U.S.C. § 1030 (Computer Fraud and Abuse)**

469.   In violation of 18 U.S.C. § 1030(a)(1), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 knowingly accessed one or more computers without authorization or exceeding authorized access, and by means of such conduct obtained information determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y of section 11 of the Atomic Energy Act of 1954, with reason to believe that such information so obtained could be used to

the injury of the United States, or to the advantage of any foreign nation, and willfully communicated, delivered, transmitted, or caused to be communicated, delivered, or transmitted, or attempted to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retained the same and failed to deliver it to the officer or employee of the United States entitled to receive it.

470.   In violation of 18 U.S.C. § 1030(a)(2)(A), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 intentionally accessed one or more computers without authorization or exceeded authorized access, and thereby obtained information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.).

471.   In violation of 18 U.S.C. § 1030(a)(2)(B), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 intentionally accessed one or more computers without authorization or exceeded authorized access, and thereby obtained information from a department or agency of the United States.

472.   In violation of 18 U.S.C. § 1030(a)(2)(C), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 intentionally accessed one or more

computers without authorization or exceeded authorized access, and thereby obtained information from a protected computer.

473.   In violation of 18 U.S.C. § 1030(a)(6), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 knowingly and with intent to defraud trafficked (as defined in section 1029 [18 U.S.C § 1029]) in any password or similar information through which a computer may be accessed without authorization, where such trafficking affected interstate or foreign commerce.

474.   In violation of 18 U.S.C. § 1030(a)(6), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10, with intent to extort from any person any money or other thing of value, transmitted in interstate or foreign commerce one or more communications containing threats to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access.

475.   In violation of 18 U.S.C. § 1030(b), Adams, Becker, Boback, Chopra, Clark, Hansberry, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 conspired to commit or attempted to commit an offense under subsection (a) of this section.

### (ii)    18 U.S.C. § 2252A (Child Pornography)

476.   In violation of 18 U.S.C. § 2252A(a)(1), Defendants Boback, Tiversa and Does 1-10 knowingly mailed or transported or shipped using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, child pornography.

477.   In violation of 18 U.S.C. § 2252A(a)(2), Defendants Boback, Tiversa and Does 1-10 knowingly received and/or distributed child pornography that had been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or any material that contained child pornography that had been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

478.   In violation of 18 U.S.C. § 2252A(a)(5)(B), Defendants Boback, Tiversa and Does 1-10 knowingly possessed, or knowingly accessed with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that had been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means,

including by computer, or that was produced using materials that had been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

479.   In violation of 18 U.S.C. § 2252A(a)(7), Defendants Boback, Tiversa and Does 1-10 knowingly produced with intent to distribute, or distributed, by any means, including a computer, in or affecting interstate or foreign commerce, child pornography that is an adapted or modified depiction of an identifiable minor.

480.   In violation of 18 U.S.C. § 2252A(b), Defendants Boback, Tiversa and Does 1-10 attempted or conspired to violate, paragraph (1), (2), (5) and (7) of subsection (a).

### (iii)   18 U.S.C. § 2319 (Criminal Infringement of a Copyright)

481.   In violation of 18 U.S.C. § 2319(a), Defendants Boback, Tiversa and Does 1-10 willfully infringed one or more copyrights for purposes of commercial advantage or private financial gain.

### k.    18 U.S.C. § 2314 (National Stolen Property Act)

482.   In violation of 18 U.S.C. §2314, Defendants Boback, Kline, Johnson, Morgan Lewis, Tarquinio, Tiversa, Dartmouth and Does 1-10 knowingly transported, transmitted, or transfered in interstate or foreign commerce goods,

wares, merchandise, securities or money, of the value of $ 5,000 or more, knowing the same to have been stolen, converted or taken by fraud.

483.   In violation of 18 U.S.C. §2314, Defendants Boback, Kline, Johnson, Morgan Lewis, Tarquinio, Tiversa, Dartmouth and Does 1-10 knowingly devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transported or caused to be transported, or induced any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $ 5,000 or more.

484.   The foregoing predicate acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  As detailed in the foregoing allegations, Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 acted with an unlawful purpose, and with unlawful means, to: (i) convert LabMD's property; (ii) defame LabMD; and (iii) interfere with LabMD's business relations.

485.   Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 utilized the predicate acts set forth above to accomplish and further the Enterprise's illegal scheme.  Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper

Hamilton and Does 1-10's actions are violations of public policy, violations of state and federal statutes, and affect interstate commerce. The nature of Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10's predicate acts involves a distinct threat of long-term racketeering activity.

486.   The acts committed by Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 are not isolated events, but represent a pattern of deceptive, fraudulent, and illegal practice occurring on a regular basis. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit.

487.   By direct and proximate reason of Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 pattern of racketeering activity and the predicate acts it comprises, Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT II – FEDERAL RICO CONSPIRACY (18 U.S.C. § 1962(d))

488.   LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

489.  This Count is against Defendants Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10.[9]

490.  Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 agreed and conspired to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity involving the following predicate acts: 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1512 (Witness Tampering), 18 U.S.C. § 1513 (Witness Retaliation), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2319 (Criminal Infringement of a Copyright), 18 U.S.C. § 2314 (National Stolen

---

[9] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

Property Act), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-93 (Witness Tampering), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity)

491.  Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 each knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes describe above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

492.  By direct and proximate reason of the aforementioned conduct, Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT III – GEORGIA RICO (O.C.G.A. § 16-14-4)

493.  LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

494.  This Count is against Defendants Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10.

495.  Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 were employed by or associated with an enterprise engaged in and whose activities affect interstate commerce.  The common purpose of the Enterprise is to commercially benefit by making misrepresentations about data privacy and security breaches to unsuspecting consumers, the media, and the public, and to otherwise engage in tortious activities that advance their purpose.

496.  Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 are each associated with the Enterprise. Each conducts and participates in the Enterprise's affairs. Boback manages, operates, and directs the affairs of the Enterprise.

497.  Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 agreed to, and knowingly, intentionally, and willfully participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity, and for the unlawful purpose of harming Plaintiff and others.

498.  Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 intentionally and willingly devised and participated in a scheme to harm LabMD and Daugherty in an effort to deprive LabMD and Daugherty of their property, economic opportunities and reputations, and knowingly and intentionally violated at least the following predicate acts: 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1512 (Witness Tampering), 18 U.S.C. § 1513 (Witness Retaliation), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1030 (Computer Fraud and Abuse), 18 U.S.C. § 2319 (Criminal Infringement of a Copyright), 18 U.S.C. § 2314 (National Stolen Property Act), O.C.G.A. § 16-9-1 (Forgery), O.C.G.A. § 16-9-93 (Computer Crimes), O.C.G.A. § 16-10-70 (Perjury), O.C.G.A. § 16-10-93 (Witness Tampering), O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity) and O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity).

  a.    **O.C.G.A. § 16-9-1 (Forgery)**

499.  In violation of O.C.G.A. § 16-9-1(b), Defendants Boback, Chopra, Tagliaferri, Tiversa and Does 1-10, with the intent to defraud, knowingly made, altered, or possessed any writing, other than a check, in a fictitious name or in such manner that the writing as made or altered purports to have been made by

another person, at another time, with different provisions, or by authority of one who did not give such authority and utters or delivers such writing.

500.  In violation of O.C.G.A. § 16-9-1(c), Defendants Boback, Chopra, Tagliaferri, Tiversa and Does 1-10, with the intent to defraud, knowingly made, altered, or possessed any writing, other than a check, in a fictitious name or in such manner that the writing as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority.

### b.    **O.C.G.A. § 16-9-93 (Computer Crimes)**

501.  In violation of O.C.G.A. § 16-9-93(a) (Computer Theft), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 used a computer or computer network with knowledge that such use was without authority and with the intention of (1) taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession; (2) obtaining property by any deceitful means or artful practice; or (3) converting property to Defendants' use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property.

502.  In violation of O.C.G.A. § 16-9-93(b) (Computer Trespass), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 used a computer

or computer network with knowledge that such use was without authority and with the intention of (1) deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network; (2) obstructing, interrupting, or in any way interfering with the use of a computer program or data; or (3) altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists.

503. In violation of O.C.G.A. § 16-9-93(c) (Computer Invasion of Privacy), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 used a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination was without authority.

504. In violation of O.C.G.A. § 16-9-93(d) (Computer Forgery), Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10 created, altered, or deleted data contained in a computer or computer network, who, if these defendants had created, altered, or deleted a tangible document or instrument would have committed forgery under Article 1 of Chapter 9 of Title 16 of the Official Code of Georgia Annotated.

505. In violation of O.C.G.A. § 16-9-93(e) (Computer Password Disclosure), Defendants Boback, Tiversa, and Does 1-10 disclosed a number, code, password, or other means of access to a computer or computer network knowing that such disclosure was without authority and which resulted in damages (including the fair market value of any services used and victim expenditure) to the owner of the computer or computer network in excess of $500.00.

### c.    O.C.G.A. § 16-9-121 (Identity Fraud)

506. In violation of O.C.G.A. § 16-9-121(a), Defendants Boback, Tiversa and Does 1-10 willfully and fraudulently (1) without authorization or consent, used or possessed with intent to fraudulently use identifying information concerning a person; (2) used or possessed with intent to fraudulently use identifying information concerning a deceased individual; (3) created, used, or possessed with intent to fraudulently use any counterfeit or fictitious identifying information concerning a fictitious person with intent to use such counterfeit or fictitious identification information for the purpose of committing or facilitating the commission of a crime or fraud on another person; or (4) without authorization or consent, created, used, or possessed with intent to fraudulently use any counterfeit or fictitious identifying information concerning a real person with

intent to use such counterfeit or fictitious identification information for the purpose of committing or facilitating the commission of a crime or fraud on another person.

### d.    **O.C.G.A. § 16-10-70 (Perjury)**

507.    In violation of O.C.G.A. § 16-10-70, Defendants Tiversa, Boback and Chopra, after having been administered a lawful oath or affirmation, committed the offense of perjury when, in a judicial proceeding, they knowingly and willfully made a false statement material to the issue or point in question.

### e.    **O.C.G.A. § 16-10-93 (Witness Tampering)**

508.    In violation of O.C.G.A. § 16-10-93(a), Defendants Boback, Tiversa and Does 1-10, with intent to deter a witness from testifying freely, fully, and truthfully to a matter pending in a court and in an administrative proceeding, communicated, directly or indirectly, to such witness one or more threats of injury or damage to the person, property, or employment of the witness or to the person, property, or employment of any relative or associate of the witness or who offers or delivers any benefit, reward, or consideration to such witness or to a relative or associate of the witness.

### f.    O.C.G.A. § 16-14-3(5)(b) (Racketeering Activity)

509.   In violation of O.C.G.A. § 16-14-3(5)(b), Defendants Boback, Chopra, Hansberry, Hopkins, Kline, Johnson, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 received stolen property, committed extortion and/or obstructed justice.

### g.    O.C.G.A. § 16-14-3(5)(c) (Racketeering Activity)

510.   In violation of O.C.G.A. § 16-14-3(5)(b), Defendant Adams, Becker, Boback, Chopra, Clark, Hansberry, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10's conduct included all of the Federal RICO Predicate Acts set forth above.

511.   The predicate acts set forth above constitute a pattern of racketeering activity.  As detailed in the foregoing allegations, Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 acted with an unlawful purpose, and with unlawful means, to: (i) convert LabMD's property; (ii) defame LabMD; and (iii) interfere with LabMD's business relations.

512.   Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 utilized the predicate

acts set forth above to accomplish and further the Enterprise's fraudulent scheme and Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10's actions are violations of public policy, violations of state and federal statutes and affect interstate commerce. The nature of Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10's predicate acts involves a distinct threat of long-term racketeering activity.

513. The acts committed by Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 are not isolated events, but represent a pattern of deceptive, fraudulent, and illegal practice occurring on a regular basis. Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit.

514. By direct and proximate reason of the aforementioned conduct, Boback, Chopra, Hansberry, Johnson, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT IV – GEORGIA RICO CONSPIRACY (O.C.G.A. § 16-14-4(c))

515.  LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

516.  This Count is against Defendants Adams, Becker, Boback, Chopra, Clark, Hansberry, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10.

517.  Adams, Becker, Boback, Chopra, Clark, Hansberry, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 agreed and conspired to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

518.  Adams, Becker, Boback, Chopra, Clark, Hansberry, Hopkins, Johnson, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 each knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes describe above.

519.  By direct and proximate reason of the aforementioned conduct, Adams, Becker, Boback, Chopra, Clark, Hansberry, Hopkins, Johnson, Kline,

Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Tiversa, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

### COUNT V – COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)

520. LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

521. This Count is against Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10.

522. Boback, Johnson, Tiversa, Dartmouth and Does 1-10's actions in downloading to an electronic storage device data files from LabMD's computer system for a reason it knew was not authorized and during a time in which it knew such access would not have been authorized constitute violations of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*.

523. Boback, Johnson, Tiversa, Dartmouth and Does 1-10's actions in downloading LabMD's files exceeded its authorization.

524. By direct and proximate reason of the aforementioned conduct, Boback, Johnson, Tiversa, Dartmouth and Does 1-10's are liable, jointly and

severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

### COUNT VI – GEORGIA COMPUTER CRIMES (O.C.G.A. § 16-9-93(g))

525. LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

526. This Count is against Defendants Boback, Johnson, Tiversa, Dartmouth and Does 1-10.

527. Boback, Johnson, Tiversa, Dartmouth and Does 1-10's actions in downloading to an electronic storage device data files from LabMD's computer system for a reason it knew was not authorized and during a time in which it knew such access would not have been authorized constitute violations of O.C.G.A. § 16-9-93(g).

528. Boback, Johnson, Tiversa, Dartmouth and Does 1-10's actions in downloading LabMD's files exceeded its authorization.

529. By direct and proximate reason of the aforementioned conduct, Boback, Johnson, Tiversa, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT VII – COMMON LAW FRAUD

530. LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

531. This Count is against Defendants Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 ("Common Law Fraud Defendants").[10]

532. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 knew at the time that they made their false statements and material omissions, that such representations, omissions and fabrications were untrue and that Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 were concealing material facts from LabMD, Daugherty, the FTC, Congress, the courts and others.

533. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 acted with the intention to deceive and mislead Daugherty, LabMD and others, to fraudulently induce LabMD, Daugherty and

---

[10] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

thereby enable Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 to profit while harming LabMD, Daugherty and others.

534.  Daugherty, LabMD and others acted in reasonable reliance upon Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10's false representations and material omissions, and were thereby induced to rely upon those false representations and material omissions to their detriment.

535.  At the time Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 made these knowingly false statements, they intended to mislead and had actual knowledge that they were deliberately misleading LabMD, Daugherty and others.

536.  Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10's actions in making these and other knowingly false statements to LabMD, Daugherty and others were willful, wanton, outrageous, and in conscious disregard of LabMD and Daugherty's rights under law.

537.  By direct and proximate reason of the aforementioned conduct, the Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT VIII – COMMON LAW NEGLIGENCE

538.  LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

539.  This Count is against Defendants Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10.[11]

540.  Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 were negligent in not knowing that Tiversa and Boback's fraudulent statements were lies, were negligent in not conducting reasonable inquiries to determine the truth of those statements and, based on that negligence, proceeded to act in furtherance of illegal conduct.

541.  By direct and proximate reason of the aforementioned conduct, the Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

---

[11] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

## COUNT IX – FRAUDULENT MISREPRESENTATION

542. LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

543. This Count is against Defendants Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10.[12]

544. At the time Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 made their false representations and material omissions, they had no reasonable ground for believing them to be true.

545. Each of the false representations and omissions were made by Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 in an intentionally or grossly negligent manner not warranted by the information those defendants had concerning the subject matter of the representations and without regard to whether or not they were true.

546. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 knew or should have known that the foregoing and above described representations and omissions were false when made.

---

[12] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

547. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 had a duty to refrain from making the foregoing and above described false representations.

548. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 each breached their respective duty by making the foregoing and above described false representations.

549. It was reasonably foreseeable to Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 that LabMD, Daugherty and others would rely on such false or incomplete information, and LabMD and Daugherty did so to their detriment.

550. By direct and proximate reason of the aforementioned conduct, Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT X – NEGLIGENT MISREPRESENTATION

551. LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

552. This Count is against Defendants Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10.[13]

553. Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 were negligent in not knowing that Tiversa's fraudulent statements were lies, were negligent in not conducting reasonable inquiries to determine the truth of such statements and, based on that negligence, proceeded to act on behalf of the Enterprise in furtherance of Tiversa's illegal conduct.

554. At the time Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 made the foregoing false representations and material omissions to LabMD, Daugherty and others, they had no reasonable ground for believing them to be true.

555. The false representations and omissions made by Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 were made in a reckless and negligent manner not warranted by the information those defendants had concerning the subject matter of the representations and without regard to whether or not they were true.

---

[13] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

556.   The Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 had a duty to refrain from making the foregoing and above described false representations.

557.   The Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 each breached their respective duty by making the foregoing and above described false representations.

558.   It was reasonably foreseeable to Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 that LabMD, Daugherty and others would rely upon such false or incomplete information, and LabMD, Daugherty and others did so to the detriment of LabMD and Daugherty.

559.   By direct and proximate reason of the aforementioned conduct, Hansberry, Kline, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT XI – COMMON LAW CONSPIRACY

560.   LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

561.  This Count is against Defendants Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10. [14]

562.  Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 have a common design and purpose to achieve their goal of commercially benefitting from theft and misrepresentations about data security breaches, which specifically harmed LabMD through Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10'a violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), Georgia Computer Crimes (O.C.G.A. § 16-9-93(g)) and said Defendants' Common Law Fraud, Common Law Negligence, Fraudulent Misrepresentation, Negligent Misrepresentation, Defamation, Conversion and Tortious Interference.

563.  Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton,

---

[14] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

Dartmouth and Does 1-10 have acted in concert with an unlawful, malicious, and willful common purpose, and with unlawful means, to violate the Computer Fraud and Abuse Act (18 U.S.C. § 1030), and Georgia Computer Crimes (O.C.G.A. § 16-9-93(g)) and said defendants' Common Law Fraud, Common Law Negligence, Fraudulent Misrepresentation, Negligent Misrepresentation, Defamation, Conversion and Tortious Interference.

564.   Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 took overt acts in furtherance of this unlawful conspiracy.

565. LabMD and Daugherty have sustained damages as a direct and proximate result of Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10's unlawful conspiracy. These damages include loss of profits and damage to and loss of LabMD's reputation and goodwill and loss of reputation and economic opportunities for Daugherty.

566.  By direct and proximate reason of the aforementioned conduct, Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and

Does 1-10 are liable, jointly and severally, for the injuries LabMD and Daugherty have suffered, including money damages in amounts to be proven at trial.

## COUNT XII – ATTORNEYS' FEES AND EXPENSES

567. LabMD and Daugherty reincorporate each of the foregoing paragraphs as if they were fully set forth herein.

568. This Count is against Defendants Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10.[15]

569. LabMD and Daugherty are entitled to recover their attorneys' fees and court costs pursuant to 18 U.S.C. § 1964(c).

570. Moreover, Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10 have acted in bad faith toward LabMD and Daugherty in the events giving rise to this lawsuit, have been stubbornly litigious, and have put LabMD to unnecessary trouble and expense. Pursuant to Georgia law, O.C.G.A. § 13-6-11, LabMD and Daugherty are entitled

---

[15] Due to the pendency of *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback and M. Eric Johnson*, in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MRH-MPK, Defendants Boback, Tiversa and Johnson are not included in this count at this time.

to recover from Adams, Becker, Chopra, Clark, Hansberry, Hopkins, Kline, Kopchak, Ponemon, Schmidt, Tagliaferri, Tarquinio, Morgan Lewis, Pepper Hamilton, Dartmouth and Does 1-10, jointly and severally, their expenses of litigation, including reasonable attorneys' fees in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, LabMD and Daugherty respectfully prays for the following relief:

(a)  that LabMD and Daugherty receive a trial by jury;

(b)  that the Court enter judgment in favor of LabMD and Daugherty, and against Defendants, jointly and severally, on all counts, in amount(s) to be proven at trial, including awarding against each Defendant actual, special, consequential and/or compensatory damages, including lost profits;

(c)  that judgment be entered awarding to LabMD and Daugherty, and against each Defendant, punitive damages;

(d)  that judgment be entered awarding to LabMD and Daugherty, and against each Defendant, enhanced and/or treble damages;

(e)  that LabMD and Daugherty be awarded their expenses and costs and disbursements of litigation, including their costs and reasonable attorneys' fees;

(f)  that LabMD and Daugherty be awarded pre-judgment and post-judgment interest as provided by law; and

(g)  that LabMD and Daugherty be awarded such other relief as the Court deems just, equitable and proper.

**JURY TRIAL DEMANDED.**

Respectfully submitted,

Dated:  July 8, 2016


**JAMES W. HAWKINS, LLC**

*/s/ James W. Hawkins*
James W. Hawkins
Georgia State Bar No. 338767
JAMES W. HAWKINS, LLC
11339 Musette Circle
Alpharetta, GA 30009
V: 678-697-1278
F: 678-540-4515
jhawkins@jameswhawkinsllc.com

*Attorney for Plaintiffs LabMD, Inc. and*
*Michael J. Daugherty*

## CERTIFICATE OF COMPLIANCE AS TO FONT SIZE

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing complies with the font and point selections approved by the Court in Local Rule 5.1C. The foregoing was prepared on a computer using Times New Roman font (14 point).

*/s/ James W. Hawkins*
James W. Hawkins
Georgia State Bar No. 338767
JAMES W. HAWKINS, LLC
11339 Musette Circle
Alpharetta, GA 30009
V: 678-697-1278
F: 678-540-4515
jhawkins@jameswhawkinsllc.com

*Attorney for Plaintiffs LabMD, Inc. and Michael J. Daugherty*